[Cite as *State v. Hayes*, 2013-Ohio-2429.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | | C.A. No.    26388 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| DANIEL M. HAYES | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No.    CR 10 10 2930 |

DECISION AND JOURNAL ENTRY

Dated: June 12, 2013

WHITMORE, Judge.

{¶1}    Defendant-Appellant, Daniel Hayes, appeals from his convictions in the Summit County Court of Common Pleas.  This Court affirms.

I

{¶2}    At approximately 7:00 a.m. on October 7, 2010, members of the SWAT team entered one of the ground-level apartments at 582 Talbot Avenue to execute a search warrant there.  The apartment building at 582 Talbot Avenue consists of four apartments, two of which are ground-level and two of which are directly above the ground-level apartments.  All of the apartments share a common entryway at the front of the building and the apartments on each of the two floors share a common hallway.  The ground-level apartment the SWAT team members entered was located on the south side of the apartment building.

{¶3}    Hayes and a female companion were present at the apartment when the SWAT team executed the warrant.  Numerous SWAT team members and one of the apartment's

residents testified that the team members loudly announced themselves before entering the apartment. Moreover, the team members used battering rams to open the back door to the apartment and the common entryway at the front of the building. Nevertheless, Hayes testified that he never heard the team members announce themselves and thought a robbery was occurring. As SWAT team members entered the apartment, Hayes fired a gun three times from the apartment's bedroom in three distinct directions. He then threw the gun out of one of the windows and surrendered. The search of the apartment later uncovered a large amount of heroin.

{¶4} A grand jury indicted Hayes on each of the following counts: (1) three counts of felonious assault, in violation of R.C. 2903.11(A)(2); (2) improperly discharging a firearm at or into a habitation, in violation of R.C. 2923.161(A)(1); (3) having weapons while under disability, in violation of R.C. 2923.13(A)(2); and (4) possession of heroin,[1] in violation of R.C. 2925.11(A)(C)(4). The three felonious assault counts also contained attendant firearm specifications, pursuant to R.C. 2941.145. A jury found Hayes guilty on all counts. The trial court merged the charge for improperly discharging a firearm into one of the felonious assault counts, but sentenced Hayes on all the remaining charges. The court sentenced Hayes to a total of 18 years in prison.

{¶5} Hayes now appeals and raises three assignments of error for our review. For ease of analysis, we reorder the assignments of error.

II

<u>Assignment of Error Number Two</u>

THE TRIAL COURT'S DECISION TO FIND THE ACCUSED GUILTY OF FELONIOUS ASSAULT, IN VIOLATION OF R.C. 2903.11, IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

---

[1] Hayes was initially indicted for the possession of cocaine, but the charge was later amended without objection.

**{¶6}** In his second assignment of error, Hayes argues that his felonious assault convictions are against the manifest weight of the evidence. We disagree.

**{¶7}** In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

**{¶8}** The felonious assault statute provides, in relevant part, that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). Hayes argues that the State failed to show that he knowingly attempted to cause harm to anyone. According to Hayes, the evidence was such that he fired several gunshots to serve as a warning to a possible intruder after he was startled awake. Hayes argues that he never saw or directly fired at anyone, so the State "failed to prove that [he] had the proper mental state to be convicted of felonious assault."

{¶9} Initially, we note that Hayes' argument could be read as a challenge to the sufficiency of the evidence rather than the weight of the evidence. A weight challenge tests the persuasiveness of the evidence the State produced while a sufficiency challenge tests the very production of that evidence. *See State v. Porter*, 9th Dist. No. 24996, 2010-Ohio-3980, ¶ 9. An argument that the State failed to prove one of the elements of a crime is one sounding in sufficiency, not weight. *See generally State v. Witcher*, 9th Dist. No. 26111, 2012-Ohio-4141, ¶ 18-20. Hayes specifically asserts that the State failed to prove the mens rea element of felonious assault. Nevertheless, the overarching point of his argument appears to be that the evidence produced should have persuaded the jury that he never meant to harm anyone when he fired a gun. Thus, this Court will review Hayes' argument as a manifest weight challenge, in accordance with his captioned assignment of error. *See Taylor v. Hamlin-Scanlon*, 9th Dist. No. 23873, 2008-Ohio-1912, ¶ 12 ("[A]n appellant's assignment of error provides this Court with a roadmap to guide our review.").

{¶10} Several members of the SWAT team that executed the warrant at 582 Talbot Avenue testified at trial about their observations at the time they served the warrant. Officers Zachary Magaw and Brian French and Detective Patrick Leonard were all members of the team that entered the apartment from the rear. All three testified that the entire SWAT team yelled "Akron Police search warrant" multiple times while one of the officers banged on the door. After repeatedly announcing themselves, Officer Magaw testified that he used a battering ram to open the door. The door required three hits with the ram, as items had been propped against the door from the inside to help keep it closed. Officer Magaw testified that the SWAT team continued to loudly announce themselves throughout the entry process.

{¶11} Once the door was open, Detective Leonard visually cleared the room, which was the kitchen, and deployed a flash noise device ("FND"). Officer French explained that an FND is a pressurized law enforcement tool that releases a loud noise as well as a flash of light when it detonates. The FND acts as a distraction to stun any nearby individuals with the goal of aiding the police in making a safe entry. Additionally, because only the police have access to FNDs, Officer French testified that their very use announces the fact that police officers (i.e., not unlawful intruders) are entering a structure. There was testimony that the force of the FND Detective Leonard detonated shattered the kitchen window.

{¶12} After he deployed the FND, Detective Leonard testified that he heard a pop, but nevertheless proceeded into the apartment directly behind Officer French. Officer French testified that he heard two pops just after the FND detonated, but assumed the SWAT team members at the front door had fired a weapon. At the point when he heard the two pops, Officer French stated that he was in the apartment's kitchen, preparing to enter the living room.

{¶13} Officer Ted Male testified that he was one of the SWAT team members stationed at the apartment building's front door/common entryway. He testified that he breached the front door with a ram after he heard the SWAT team members at the back door yelling "Akron Police search warrant." He further testified that he and the other two officers at the front door were yelling "Akron Police search warrant" as he breached the front door. After Officer Male opened the door, he and the other two officers with him held at the door's threshold, outside the common hallway shared by the individual apartments. Officer Male testified that it was uncommon for SWAT members to hold at a door rather than proceed inside, but that he had been instructed to wait at the door on that particular day. From his position at the front door, Officer Male testified that he heard two distinct gunshots come from inside the apartment.

{¶14} Officer Thomas Gottas testified that he was assigned to the southeast perimeter of the apartment, such that he was standing outside and not far from the outside wall of the apartment's bedroom when the breach began. Officer Gottas testified that he heard the SWAT team yell "Akron Police search warrant" numerous times before breaching the doors, heard the FND detonate, and saw the window in the apartment's kitchen shatter from the force of the FND. At about that same time, Officer Gottas testified that he heard three gunshots. Captain Michael Shearer, the SWAT team commander who was positioned outside that day as well, also testified that he heard gunshots. Specifically, Captain Shearer stated that he thought he heard a gunshot simultaneous to the detonation of the FND and heard two gunshots after its detonation. Captain Shearer testified that he manually inspected every weapon the SWAT team members carried that day and that none of the weapons were ever discharged.

{¶15} A few seconds after he heard two pops, Officer French (the first inside the apartment by way of the rear entrance) testified that he heard glass breaking. He quickly approached the apartment's bedroom and saw Hayes with his back to him and his right hand out of the bedroom window. He then commanded Hayes to show him his hands and Hayes surrendered. From his position outside the apartment, Officer Gottas testified that, after he heard three gunshots, he saw Hayes come through the bedroom window with his arms and upper body. Officer Gottas observed that Hayes had a gun in his hand. He then yelled "police," saw Hayes drop the gun onto the ground, and watched as Hayes pulled himself back inside the apartment.

{¶16} Detective Anna Romito testified that she responded to the apartment as part of the crime scene unit after the breach concluded. Detective Romito testified that the police found three shell casings at the bottom of the bed in the apartment as well as three bullet holes. Although the police only removed one of the three bullets for testing, Detective Romito testified

that the bullets were located: (1) in the wall of the living room, leading into the kitchen; (2) in the wall of an archway, leading into the living room from the front door area; and (3) in the outside wall of the apartment across the hall, having passed through the bedroom wall, the stairwell, and the common hallway leading to the front door of the apartment building. As a part of her investigation, Detective Romito created a diagram of the apartment, the three shell casings the police found in the bedroom, and the three bullet holes the police found in the apartment, along with their respective trajectories. To aid this Court's discussion, Detective Romito's diagram has been included in the appendix attached to this opinion.

{¶17} Detective Romito testified that none of the bullets the police located had been fired into the ground or ceiling. Instead, two of the gunshots were approximately at waist-level and the third was at head level. Former Supervisor Sergeant Terrence Hudnall verified that all three bullet holes "were within the height of a person" and, given his training and experience, none of the shots appeared to have been warning shots. Ballistics testing later confirmed that the one bullet and three casings the police had tested were all consistent with having been fired from the .9mm Luger caliber Astra semi-automatic that the police recovered from the ground outside the apartment's bedroom window. Further, gunshot residue testing confirmed that the swab the police collected from Hayes had particles on it that were highly indicative of primer shot residue.

{¶18} Two different officers testified that they interviewed Hayes at the police station. Detective James Palmer testified that he interviewed Hayes with regard to the heroin the police found in the apartment, but also asked him whether he had a gun when the SWAT team entered. Hayes told Detective Palmer that he never saw a gun. Detective Bertina King testified that she specifically interviewed Hayes about the shooting incident and that Hayes denied ever touching a gun. Detective King testified that she even suggested to Hayes that he might have fired a gun if

he was concerned that a break in was occurring at the apartment. Hayes, however, continued to deny that he ever fired a gun.

{¶19} Hayes testified in his own defense. Hayes testified that he spent the night at the apartment at 582 Talbot Street with a female friend and that the two were still sleeping in the apartment's bedroom when he was awoken by a "big bang" that sounded like someone was kicking in the door. He testified that he then heard a scraping sound, which he identified as the sound of certain items he had placed against the back door being moved across the floor. Hayes explained that he had propped several items against the back door to the apartment before going to bed because he was always concerned that someone might break in. Knowing that there was a gun on the floor next to the bed, Hayes testified that he grabbed it. Hayes then heard the FND detonate, but testified that he thought it was a gunshot. According to Hayes, he never heard the SWAT team members announce themselves, so he thought a robbery was occurring. Hayes testified that he fired the gun he picked up from the floor three times in an effort to scare off any intruder. He further testified that he fired the three shots without aiming in any particular direction. After he fired the gun, Hayes stated that he heard the front door get hit and the police announce themselves. He then threw the gun out the bedroom window because he did not want to appear armed and risk getting shot when the police got to him.

{¶20} Shakendra Hill testified that she slept at the apartment with Hayes the night before the SWAT team arrived. Hill testified that she was still asleep in the morning when she heard a "big boom." Because she thought someone was breaking into the apartment, Hill then climbed out of bed and hid in between the open door of the adjacent room (labeled "Solarium" on the diagram attached to the appendix) and the bedroom wall. Subsequently, Hill testified that she saw a flash from the FND, heard gunshots, and ran into the adjacent room. According to

Hill, she never heard the SWAT team members announce themselves and never heard any glass break, including the bedroom window.

{¶21} One resident from each of the apartment building's other three apartments also testified at trial. Belinda Phinnessee testified that she lived directly above the apartment the SWAT team entered and was awake when the breach began. According to Phinnessee, she heard a window shatter, a big boom, someone say "get down," and multiple gunshots, but never heard the SWAT team announce themselves or the battering rams being used. Phinnessee agreed that, had a battering ram been used, she would have heard it.

{¶22} Darnella Cameron testified that she lived in the apartment on the ground floor directly across the hall from the apartment the SWAT team entered. Cameron testified that she was sleeping on the morning the SWAT team entered the building and was awoken by the sound of her dogs barking. Much like Phinnessee, Cameron testified that she heard glass breaking, someone say "get down," and shooting, but never heard the SWAT team announce themselves or the battering rams being used. As to the gunshots, Cameron testified that she heard a few shots, but could not recall how many because she "wasn't paying [] attention." Cameron also admitted that she suffered from poor hearing in one ear and memory loss due to a disability.

{¶23} Christopher Batte testified that he lived in the upstairs apartment across the hallway from the apartment the SWAT team entered. Batte testified that he was awake getting ready for school when he heard the police identify themselves "in very audible tones." Batte testified that he then heard some "very loud distinct booms" and walked out over the back door balcony to see what was happening. Batte testified that he could not recall if he heard any gunshots.

**{¶24}** Hayes was charged with three counts of felonious assault. The counts pertained to Officer French (the first to enter the apartment through the rear door), Detective Leonard (the second to enter through the rear door), and Detective Male (the first officer stationed at the apartment building's front door). Having reviewed the record, we cannot conclude that the jury lost its way in convicting Hayes on all three counts. As the diagram attached to the appendix shows, one of the shots that Hayes fired was fired in the direction of the back door, one was fired in the direction of the center of the apartment and its front door, and one was fired in the direction of the common hallway leading to the apartment building's front door. There was evidence that both Officer French and Detective Leonard were en route through the apartment when the two shots were fired towards the back and center of the apartment. Moreover, there was evidence that, had he been instructed differently and proceeded as the SWAT team usually does, Detective Male would have been en route through the apartment building's common hallway at the time the third shot was fired in that direction. There was testimony that all three shots were within the height of a person. None of the shots were fired into the ground and it did not appear to Supervisor Sergeant Hudnall that the shots were meant to be warning shots.

**{¶25}** To the extent Hayes argues that he fired a gun because he thought a robbery was occurring, there was extensive testimony that the SWAT team members loudly announced themselves multiple times at both the front and rear of the apartment building before entering it. Indeed, the resident of the upstairs apartment on the opposite side of the hallway heard the police identify themselves "in very audible tones." Several officers testified that they continued to announce themselves after they breached the apartment. Hill also testified that she was able to see the flash from the FND, a device available solely to law enforcement, when she was hiding in the bedroom. While Hayes claimed not to have heard any of the officers announce

themselves, he simultaneously claimed to have heard the scraping noise that was made in the kitchen when the items he used to blockade the door were moved out of the way; a slight noise in comparison to the noise the officers were making. Hayes also admitted that he lied to both Detectives Palmer and King when they asked him about having and firing a gun. Given all of the evidence in the record, the jury was free to reject Hayes' version of the events and conclude that he knowingly fired a gun three times in an attempt to cause physical harm to three different people. *See* R.C. 2903.11(A)(2); *State v. Lanik*, 9th Dist. Nos. 26192 & 26224, 2013-Ohio-361, ¶ 44 (jury free to believe some, all, or none of each witness' testimony). This is not the exceptional case where the jury clearly lost its way by convicting Hayes on three counts of felonious assault. Hayes' argument that his convictions are against the manifest weight of the evidence lacks merit. Consequently, his second assignment of error is overruled.

Assignment of Error Number Three

> THE TRIAL COURT ERRED BY ALLOWING THE JURY TO VIEW A VIDEO OF THE DEFENDANT'S INTERROGATION, AS THE VIDEO WAS UNDULY PREJUDICIAL.

{¶26} In his third assignment of error, Hayes argues that the trial court erred by allowing the jury to view an interrogation video. Specifically, he argues that the court erred by allowing the jury to view the video because its probative value was substantially outweighed by its prejudicial effect. We disagree.

{¶27} A trial court has broad discretion in admitting evidence, and this Court will not overturn its decision on appeal absent an abuse of discretion that materially prejudices a defendant. *State v. Wade*, 9th Dist. No. 02CA0076-M, 2003-Ohio-2351, ¶ 8, quoting *State v. Long*, 53 Ohio St.2d 91, 98 (1978). *Accord State v. Allen*, 73 Ohio St.3d 626, 633 (1995). An

abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶28}** Hayes argues that the interrogation video the State played here was prejudicial because: (1) in it, he discussed "previous unrelated and unindicted drug activity"; and (2) the video depicted him shirtless and wearing restraints. At trial, the State sought to play two interrogation videos. The first recorded the interrogation between Detective Palmer and Hayes. The objection to which Hayes cites in his brief as the objection to his having discussed "previous unrelated and unindicted drug activity" was entered with regard to the interrogation between Detective Palmer and Hayes. The record reflects, however, that after defense counsel objected, the State agreed not to play the interrogation recording. Instead, Detective Palmer was questioned strictly from the written report he generated as a result of the interrogation. The video of the interrogation between Detective Palmer and Hayes was not played or admitted. The jury, therefore, did not view it.

**{¶29}** The second video at issue recorded the interrogation that Detective King conducted shortly after Hayes' arrest. The video depicts Hayes shirtless with his left wrist cuffed to the table in the room. Hayes argues that the video prejudiced him because it portrayed him as a violent offender who required restraints. He further argues that the State could have simply played the audio from the video to avoid its prejudicial implications. Even assuming that to be true, however, Hayes has failed to explain how the admission of the video prejudiced him in light of all the other evidence produced at trial. *See* App.R. 16(A)(7). This Court will not conduct a prejudice analysis with regard to all of the other evidence produced at trial when Hayes has not done so. As this Court has repeatedly held, "[i]f an argument exists that can support [an]

assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone*, 9th Dist. No. 18349, 1998 WL 224934, *8 (May 6, 1998). Hayes' third assignment of error is overruled.

Assignment of Error Number One

THE TRIAL COURT ERRED IN SENTENCING THE ACCUSED ON ALL THREE COUNTS OF FELONIOUS ASSAULT AS THE CHARGES SHOULD HAVE BEEN MERGED FOR SENTENCING.

{¶30} In his first assignment of error, Hayes argues that the trial court erred by sentencing him to allied offenses of similar import. Specifically, he argues that all of his felonious assault convictions should have merged. We disagree.

{¶31} Ohio's allied offense statute provides as follows:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25. Thus, two or more offenses arising from the same conduct and similar import only may result in one conviction. R.C. 2941.25(A). Two or more offenses may result in multiple convictions, however, if: (1) they are offenses of dissimilar import; (2) they are separately committed; or (3) the defendant possesses a separate animus as to each. R.C. 2941.25(B).

{¶32} "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, syllabus. A plurality of the Ohio Supreme Court set forth a two-part test to analyze whether two offenses are allied offenses of similar import. First, one must determine whether the offenses at issue could be committed by the same conduct.

*Id.* at ¶ 47. One does so by asking "whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other." (Emphasis sic.) *Id.* at ¶ 48. *See also id.* at ¶ 66 (O'Connor, J., concurring.) (offenses are allied "when their elements align to such a degree that commission of one offense would probably result in the commission of the other offense"). Second, one must ask whether the offenses actually were committed by the same conduct, "i.e., 'a single act, committed with a single state of mind.'" *Johnson* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 50 (Lanzinger, J., concurring in judgment only). If the answer to both inquiries is yes, the offenses will merge. *Johnson* at ¶ 50.

{¶33} "Since *Johnson*, courts have identified the discharge of multiple gunshots in quick succession as the 'same conduct' under the multiple-count statute." *State v. Hodges*, 1st Dist. No. C-110630, 2013-Ohio-1195, ¶ 9. *See also State v. McClendon*, 2d Dist. No. 23558, 2011-Ohio-5067, ¶ 27-31. Nevertheless, "[w]here a defendant commits the same offense against different victims during the same course of conduct, a separate animus exists for each victim such that the offenses are not allied, and the defendant can properly be convicted of and sentenced on multiple counts." *State v. Chaney*, 8th Dist. No. 97872, 2012-Ohio-4934, ¶ 26. *Accord State v. Tapscott*, 7th Dist. No. 11 MA 26, 2012-Ohio-4213, ¶ 46. As the Legislative Service Commission Note to R.C. 2941.25 explains:

> [A] thief who commits theft on three separate occasions or steals different property from three separate victims in the space, say, of 5 minutes, can be charged with and convicted of all three thefts. In the first instance the same offense is committed three different times, and in the second instance the same offense is committed against three different victims, i.e. with a different animus as to each offense.

R.C. 2941.25, Legislative Service Commission Note (1973).

**{¶34}** Hayes argues that he did not possess a separate animus because the evidence was that he fired three shots "towards an unknown intruder" with the sole purpose of scaring that person away. According to Hayes, there was no evidence that, at the time he fired his gun, he was even aware that there was more than one person in the apartment.

**{¶35}** As the diagram attached to the appendix shows, Hayes fired three shots in three distinct directions. One shot penetrated across the living room in the space directly next to the entryway from the kitchen. Another shot penetrated the space between the front door entryway to the apartment and the entryway to the living room. The final shot penetrated through the bedroom wall into the common hallway leading to the apartment building's front door. Accordingly, despite Hayes' assertion that he fired without aiming, the three shots covered three key entry areas. There was also testimony that the SWAT team members at both the back door and the front door of the apartment yelled loudly and repeatedly announced themselves before then ramming both doors open with battering rams. Per their testimony, therefore, a significant amount of noise was generated at both the back and front of the apartment. Hayes did not fire the gun at the ground or simply discharge it three times in the same direction. Instead, he fired in three distinct directions, one of which covered the back entrance, one of which covered the front, and one of which could have covered either, depending on how far a person had walked. The record supports the conclusion that Hayes fired the gun three separate times with a separate animus. As such, the trial court did not err by sentencing Hayes on all three felonious assault counts. Hayes' first assignment of error is overruled.

III

**{¶36}** Hayes' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

CARR, J.
CONCURS.

BELFANCE, P. J.
CONCURRING IN JUDGMENT ONLY.

{¶37} I concur in the majority's judgment; however, I would analyze the allied offense issue differently. The evidence establishes that there were three shots fired in rapid succession, thus suggesting one course of conduct. However, where one criminal act has been committed

which results in harm to multiple victims, the Ohio Supreme Court has found such offenses to constitute crimes of dissimilar import. *See State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 48 ("Even though appellant set only one fire, each aggravated arson count recognizes that his action created a risk of harm to a separate person. * * * [Therefore,] appellant's conduct caused six offenses of dissimilar import because six different people were placed at risk."). *See also State v. Jones*, 18 Ohio St.3d 116, 118 (1985) ("The conduct prohibited by R.C. 2903.06 is recklessly causing the death of another. It is a homicide statute. * * * For this reason, we hold that R.C. 2903.06 authorizes a conviction for each person killed by a reckless driver. * * * [W]e view appellant's conduct as representing two offenses of dissimilar import-the "import" under R.C. 2903.06 being each person killed."). In my view, the conduct here would represent offenses of dissimilar import as described in *Jones* and *Franklin*. *See Jones* at 118; *Franklin* at ¶ 48. *See also* R.C. 2941.25(B). Accordingly, the trial court correctly determined that they should not merge.

APPEARANCES:

GREGORY A. PRICE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

Appendix 1

