[Cite as *State v. Jackson*, 2013-Ohio-5557.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 26757 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JAMELLE JACKSON | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2012-10-2951 |

DECISION AND JOURNAL ENTRY

Dated: December 18, 2013

BELFANCE, Judge.

{¶1} Jamelle Jackson appeals his convictions from the Summit County Court of Common Pleas. For the reasons set forth below, we affirm in part and reverse in part.

I.

{¶2} Braylon Rogers, Columbus Jones, Mark Jones, Demetrius Wright and Mr. Jackson attended a party at a fraternity house in Youngstown, Ohio early in the morning of February 6, 2011. With the exception of Mark Jones, all of the men were armed with handguns. While at the party, Mr. Rogers got into an argument with a woman. Dannie Williams, the woman's brother, came to see what the problem was, and Mr. Rogers punched him. Mr. Williams left the party and returned with his friend Durrell Richardson, and they proceeded to fight Mr. Rogers and Columbus Jones. Members of the fraternity broke up the fights and made Mr. Rogers and Columbus Jones leave. After the group had left the house, Columbus Jones and

a second man proceeded to shoot through the open patio door into the house, injuring numerous partygoers in the process. Jamail Johnson was shot multiple times and died from his injuries.

{¶3} Mr. Jackson was indicted on 2 counts of murder, 11 counts of felonious assault, and one count each of improperly discharging a firearm at or into a habitation and carrying a concealed weapon. The murder, felonious assault, and improper discharge counts also contained underlying firearm specifications. Due to concerns about the effect of the media coverage of the case on the jury pool, the case was transferred from the Mahoning County Court of Common Pleas to the Summit County Court of Common Pleas. The State dismissed one of the felonious assault charges against Mr. Jackson, but a jury found him guilty of the remaining charges. The trial court sentenced Mr. Jackson to a prison term of 90 years to life.

{¶4} Mr. Jackson has appealed, raising two assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

THE APPELLANT'S CONVICTIONS FOR MURDER, FELONIOUS ASSAULT, AND IMPROPER DISCHARGE OF A FIREARM INTO A HABITATION IN THIS CASE WERE BASED ON INSUFFICIENT EVIDENCE AND WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND AS A RESULT, APPELLANT'S RIGHTS AS PROTECTED BY ARTICLE IV SECTION 3 OF THE OHIO CONSTITUTION WERE VIOLATED.

{¶5} Although Mr. Jackson alleges in his first assignment of error that his convictions are not supported by sufficient evidence, he does not develop any argument in support. *See* App.R. 16(A)(7). Instead, he focuses solely upon whether the jury's determination that he was one of the shooters on February 6, 2011, was against the manifest weight of the evidence. We confine our analysis accordingly.

{¶6} In reviewing a challenge to the weight of the evidence, the appellate court

> [m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶7} Mr. Jackson was convicted of violating R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." Mr. Jackson was also found guilty of violating R.C. 2903.11(A)(2), which provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance," and R.C. 2923.12(A)(2), which provides that "[n]o person shall knowingly carry or have, concealed on the person's person or concealed ready at hand * * * [a] handgun other than a dangerous ordnance[.]" Finally, the jury also found Mr. Jackson guilty of improperly discharging a firearm in violation of R.C. 2923.161(A)(1). R.C. 2923.161(A)(1) provides that "[n]o person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual[.]" "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶8} Mr. Jackson does not dispute that shots were fired at the fraternity house on February 6, 2011, that Mr. Johnson was shot and killed, or that ten other people were injured.[1] Instead, Mr. Jackson argues that the jury's determination that he was one of the shooters is against the manifest weight of the evidence. Essentially, Mr. Jackson's argument is about identity.

{¶9} Mr. Rogers testified that he attended a party at a fraternity house on 55 Indiana in Youngstown, on February 6, 2011, with Columbus Jones, Mark Jones, Mr. Jackson, and Demetrius Wright. With the exception of Mark Jones, all the men were armed; Mr. Rogers had a 9mm handgun, Mr. Jackson had a .45 caliber Glock handgun, and Columbus Jones and Mr. Wright had .40 caliber handguns. When the men attempted to enter the party, members of the fraternity patted them down and discovered Columbus Jones' gun. However, according to Mr. Rogers, although the fraternity members would not let Columbus Jones into the party with his gun, he managed to sneak it into the party anyway. Eventually, he gave his gun to his brother Mark Jones to hold while he danced with a girl.

{¶10} Mr. Rogers testified that, during the party, a woman put her arm on him for support, which he did not appreciate, and Mr. Rogers pushed her away. An argument ensued, and the woman's brother, Mr. Williams, came to her defense. Mr. Rogers punched Mr. Williams in the face, and Mr. Williams and his sister left the party. Mr. Williams returned with his friend Durrell Richardson. Mr. Williams and Mr. Richardson started fighting with Mr. Rogers and

---

[1] Durrell Richardson, Shavai Owens, Jaleesa Moore, Ebony Michel, Jamie Ruffin, D'Anthony Brown, Lisette Encarnacion, Selina Howard, Jordan Wagner, and Tejohn Lawrence all testified that they attended the party that night, that shots were fired, and that they sustained injuries from the gunfire.

Columbus Jones. Members of the fraternity broke the fight up and made Mr. Rogers and Columbus Jones leave. Mr. Rogers exited the house and observed Mr. Jackson and Columbus Jones a few feet away from the porch. Columbus Jones asked his brother for his gun and started shooting once his brother handed it to him. After Columbus Jones stopped shooting, Mr. Jackson started shooting. According to Mr. Rogers, when Mr. Jackson began shooting, he was not standing on the porch but, "about halfway through his shooting, he scoot[ed] up to the porch." Mr. Rogers testified that Mr. Jackson was wearing dark clothes and a black and red hat that night.

{¶11} According to Mr. Rogers, Columbus Jones, Mark Jones, Mr. Jackson, Mr. Wright, and he returned to the house Columbus Jones shared with Mr. Wright. Columbus Jones and Mr. Jackson reloaded their guns, and Mr. Rogers pretended to reload his gun because he wanted them to believe he had shot at the house with them. Mr. Rogers testified that Mr. Jackson loaded ten rounds into his gun. The men also wiped their guns down with ammonia, hoping to remove any gunshot residue.

{¶12} Mr. Rogers spent the rest of the night at the house and went home in the morning. Later that day, Mr. Rogers received a phone call from Mr. Jackson, who told him that police were outside the home of Columbus Jones and Mr. Wright and that the police were looking for Mr. Rogers. Mr. Jackson came with Mr. Wright and Columbus Jones to pick up Mr. Rogers, and the men went to stay with Columbus Jones' cousin. However, Mr. Rogers' mother contacted him and told him the police were at her house looking for him. He spoke with an officer on the phone and agreed to turn himself in, which he did that day.

{¶13} Mr. Williams testified that he came to the party at the fraternity house with his sister and his friend Vic Toney. While they were there, Mr. Williams saw his sister arguing with

Mr. Rogers. He approached Mr. Rogers to see what the problem was and, while they were talking, Mr. Rogers punched him. Mr. Williams left the party with his sister and Mr. Toney. They met up with Mr. Richardson, whom Mr. Williams knew through his boxing trainer. The group returned to the party and started fighting with Mr. Rogers and Columbus Jones. The fight broke up and Mr. Williams went out on the porch to look for his sister. Mr. Jackson, whom Mr. Williams described as wearing a black polo shirt with a red horse logo that night, approached Mr. Williams on the porch, and the two men exchanged words. Mr. Williams walked towards Mr. Jackson, planning to punch him, but stopped when Mr. Jackson stepped back and pulled out a gun. Mr. Williams went back into the house to look for Mr. Richardson. Shortly thereafter, someone started shooting at the back of the house.

{¶14} Other witnesses testified that they saw Mr. Rogers, Columbus Jones, and a man in red in the backyard immediately before the shooting. However, only Shavai Owens testified that she saw Mr. Jackson holding a gun. Durrell Richardson testified that, prior to the shooting, he saw three men outside the house: Mr. Rogers, Columbus Jones, and a third man dressed in red. Similarly, Tieara Jones testified that she decided to leave the party after observing a fight and, when she was walking off the back porch, she saw a black male in a hoodie with red on it holding a gun. Jordan Wagner also testified that he saw a person in a t-shirt and red hat produce a gun following the second fight between Mr. Rogers and Mr. Williams. However, Mr. Richardson, Ms. Jones, and Mr. Wagner did not see anyone shoot at the house.

{¶15} Michael Roberts testified that he worked for the Bureau of Criminal Identification and Investigation and that he examined the shell casings and bullets recovered in connection with the shooting at the fraternity house. According to Mr. Roberts, the police recovered 10 .40-caliber casings and 11 .45-caliber casings. Mr. Roberts testified that, based on his examination

of the casings, the .45-caliber weapon was likely manufactured by Glock. Bullets of both calibers were recovered from the body of Mr. Johnson.

{¶16} Mr. Jackson argues that, to the extent the jury believed Mr. Rogers' testimony, it lost its way because Mr. Rogers' testimony was clearly self-serving. Mr. Jackson points to the plea deal Mr. Rogers received from the State in exchange for his testimony, which essentially reduced Mr. Rogers' charges from those faced by Mr. Jackson to having a weapon under disability. Furthermore, Mr. Jackson argues, Mr. Rogers also possessed a gun that night and had been involved in multiple fights. Mr. Rogers had also initially denied having a gun and had originally told the police that Mr. Jackson had a .40-caliber gun that night rather than a .45-caliber Glock. However, Mr. Jackson's attorney thoroughly cross-examined Mr. Rogers about his plea deal, his prior inconsistent statements, and his other fights were discussed at length during the trial.

{¶17} Mr. Jackson also argues that, besides Mr. Rogers, only Mr. Williams and Ms. Owens testified that they saw him with a gun. He argues that Ms. Owens' testimony lacked credibility because she did not identify him until weeks after the shooting, during which time his picture had repeatedly been on the television and she identified him as being in a tan jacket. However, his attorney cross-examined Ms. Owens about her identification, and she claimed to have never seen his picture on the television. Regardless, the jury was free to believe all, part, or none of her testimony, and it was aware of the potential issues with her identification.

{¶18} Mr. Jackson's argument about why Mr. Williams' testimony should be disregarded is less clear. Mr. Jackson appears to suggest that Mr. Williams was not credible because he had been fighting with Mr. Rogers that night and because he testified that, after he saw Mr. Jackson with the gun outside, he went back inside to look for Mr. Richardson, leaving

his sister outside with the person with a gun. However, the jury was also aware of this potential issue and could weigh the testimony accordingly.

{¶19} Mr. Jackson also argues that Mr. Richardson did not testify that Mr. Jackson had a gun and, in fact, testified that Mr. Rogers had a gun. However, as noted above, Mr. Rogers admitted he had a gun the night of the shooting. Furthermore, rather than being an affirmative statement that Mr. Jackson did not have a gun, Mr. Richardson's testimony did not include any mention of Mr. Jackson's presence immediately prior to the shooting. Mr. Richardson did testify that Mr. Rogers and Columbus Jones both had guns, but he also testified that there was a third, unidentified man in red and black who was standing with them immediately prior to the shooting. Ms. Jones and Mr. Wagner also testified that a man wearing red was present outside the house that night and both of them testified that he had a gun, which could be seen as corroborating Mr. Williams' testimony about Mr. Jackson's attire and gun possession.

{¶20} Finally, Mr. Jackson points to the testimony of Dylan Thomas and Adam Madej that they were in the yard of the house next door to the fraternity house when the shooting began and that they saw a gunman who did not match the description of Mr. Jackson. However, Mr. Thomas and Mr. Madej's testimony that there was one gunman was undermined by the testimony of Mr. Roberts that at least two guns were fired that night: a .40-caliber and a .45-caliber.

{¶21} The question of credibility is best left to the trier of fact because the trier of fact may observe the witness's demeanor and tone. *See State v. Andrews*, 9th Dist. Summit No. 25114, 2010-Ohio-6126, ¶ 28 ("The jury was able to observe the witnesses' demeanor during extensive testimony and use these observations to weigh the credibility and resolve the conflicts in the testimony."). The jury was presented with all of the evidence that Mr. Jackson argues

undermines Mr. Rogers' testimony. Mr. Jackson's attorney also made sure to point out the delay in Ms. Owens' identification of Mr. Jackson. Thus, the jury could consider those factors when determining what weight to give the testimony. The jury also heard from Mr. Thomas and Mr. Madej; however, the jury was not required to believe them in light of the testimony of the other witnesses including Mr. Roberts. *See id.* ("A verdict is not against the manifest weight of the evidence because the jury chose to believe the State's witnesses rather than the defense witnesses."). Accordingly, after a thorough review of the record, we cannot conclude that the jury lost its way and committed a manifest miscarriage of justice when it determined that Mr. Jackson shot at the fraternity house on February 6, 2011, and, thus, did not lose its way in finding Mr. Jackson guilty of the indicted counts of murder, felonious assault, and shooting into a habitation.

{¶22} Mr. Jackson's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN SENTENCING APPELLANT JACKSON TO MULTIPLE PUNISHMENTS IN VIOLATION OF R.C. 2941.25, FOR MURDER AND FELONIOUS ASSAULT, AND IMPROPERLY DISCHARGING A FIREARM AT OR INTO A HABITATION, WHICH ARE ALLIED OFFENSES FROM A SINGLE ACT WITH A SINGLE ANIMUS.

{¶23} In his second assignment of error, Mr. Jackson argues that the trial court improperly sentenced him on allied offenses of similar import because the crimes were committed in one course of action. We agree in part.

{¶24} R.C. 2941.25 provides,

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or

> similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

"Thus, two or more offenses arising from the same conduct and similar import only may result in one conviction." *State v. Hayes*, 9th Dist. Summit No. 26388, 2013-Ohio-2429, ¶ 31. "Two or more offenses may result in multiple convictions, however, if: (1) they are offenses of dissimilar import; (2) they are separately committed; or (3) the defendant possesses a separate animus as to each." *Id*.

{¶25} Whether an offender's sentences should merge is a two-part test. "The first prong looks to the import of the offenses and requires a comparison of their elements." *State v. Washington*, Slip. Op. No. 2013-Ohio-4982, ¶ 13, citing *State v. Mitchell*, 6 Ohio St.3d 416, 418 (1983). "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, syllabus. A plurality of the Court in *Johnson* set forth the standard as being "whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other[,]" (Emphasis original.) *id.* at ¶ 48, while Justice O'Connor asserted in her concurring opinion that offenses are allied "when their elements align to such a degree that commission of one offense would probably result in the commission of the other offense." *Id.* at ¶ 66 (O'Connor, J., concurring in judgment.). If the offenses are of similar import, then "a court must review the entire record, including arguments and information presented at the sentencing hearing, to determine whether the offenses were committed separately or with a separate animus." *Washington* at syllabus. "If the offenses were committed by the same conduct and with a single animus, the offenses merge." *Id*. at ¶ 13, citing *Mitchell* at 418.

{¶26} Mr. Jackson argues that all of his crimes occurred during a continuous course of conduct, i.e. shooting at the fraternity house. Therefore, Mr. Jackson argues, his convictions should merge. It is certainly true that an offender *could* commit murder, felonious assault, and discharging a weapon into a habitation with the same course of conduct; thus, the question is whether the offenses were actually committed with the same conduct.

{¶27} "Since *Johnson*, courts have identified the discharge of multiple gunshots in quick succession as the 'same conduct' under the multiple-count statute." *State v. Hodges*, 1st Dist. Hamilton No. C-110630, 2013-Ohio-1195, ¶ 9. However, as with all *Johnson*-based analysis, whether improperly discharging a firearm into a habitation merges with other offenses is a fact-specific inquiry. *See State v. Woodum*, 2d Dist. Montgomery No. 25217, 2013-Ohio-3287, ¶ 7. For example, in *State v. Whipple*, 1st Dist. Hamilton No. C-110184, 2012-Ohio-2938, the court noted that "testimony and photographic evidence demonstrated that [the defendant] and his confederates had gone on a shooting rampage at this Lincoln Heights home, shooting through vehicles, doors, windows, and walls." *Id.* at ¶ 40. The court ultimately concluded that "[t]he level of destruction unleashed by [the defendant] upon the home demonstrate[d] that he sought to do more than commit felonious assault." *Id.* at ¶ 42. By contrast, the court concluded that felonious assault and improper discharge into a habitation merged in a case where the defendant shot the victim but errant bullets struck a nearby apartment building, noting that the defendant's "immediate motive was clearly to injure [the victim] after their verbal altercation had escalated." *Hodges* at ¶ 2, 17.

{¶28} With respect to the merger of felonious assault, murder, and discharging a weapon into a habitation, this case is more similar to *Hodges* than to *Whipple*. Columbus Jones had just been ejected from the party, and the people with whom he had been fighting had just reentered

the house. Meanwhile, Mr. Jackson had also left the party and had just been threatened by Mr. Williams before Mr. Jackson had brandished his firearm at him. Unlike *Whipple* where there appeared to have been intent to cause physical destruction to property in addition to the felonious assault, Mr. Jackson and Columbus Jones fired all of their shots at the open doorway of the house and into at a hallway full of people, many of whom had been standing on the porch a few moments earlier. While Mr. Jackson no doubt was aware that he was discharging his weapon into a habitation, the evidence at trial—e.g., the argument immediately preceding the shooting, testimony from multiple witnesses that they were fleeing back into the house when Mr. Jackson and Columbus Jones began shooting—indicates that his intent was to injure the people inside and that the improper discharge of a firearm was merely incidental to that goal.[2] *Hodges* at ¶ 16. Thus, after reviewing the entirety of the record, we conclude that Mr. Jackson's conduct of discharging a firearm into a habitation was committed with the same animus as the felonious assaults and the murder, and, therefore, was an allied offense of similar import with each of the other offenses.

{¶29} Mr. Jackson also argues that his convictions for murder and felonious assault should merge. Mr. Jackson fired multiple shots through the door of a home that he knew contained many party attendees. One could infer from the circumstances that Mr. Jackson's motive was to injure multiple guests at the party and, thus, the felonious assaults were committed with separate animus. Furthermore, where one criminal act has been committed which results in harm to multiple victims, the Ohio Supreme Court has found such offenses to constitute crimes

---

[2] While the State asserts on appeal that "the multiple shots fired that evening demonstrated a separate animus for each of the offenses[,]" it does not develop any argument on this point. In any case, the record indicates that Mr. Jackson's intent was to injure or kill and that shooting into the habitation was merely ancillary to that goal.

of dissimilar import. *See State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 48 ("Even though appellant set only one fire, each aggravated arson count recognizes that his action created a risk of harm to a separate person. * * * [Therefore,] appellant's conduct caused six offenses of dissimilar import because six different people were placed at risk."); *State v. Jones*, 18 Ohio St.3d 116, 118 (1985) ("The conduct prohibited by R.C. 2903.06 is recklessly causing the death of another. It is a homicide statute. * * * For this reason, we hold that R.C. 2903.06 authorizes a conviction for each person killed by a reckless driver. * * * [W]e view appellant's conduct as representing two offenses of dissimilar import-the 'import' under R.C. 2903.06 being each person killed."). (Emphasis omitted.). *See also Hayes*, 2013-Ohio-2429, at ¶ 37 (Belfance, P.J., concurring in judgment only). Mr. Jackson's convictions for murder and felonious assault all involve different victims and, thus, should not merge. *See Franklin* at ¶ 48; *Jones* at 118.

{¶30} Accordingly, Mr. Jackson's second assignment of error is sustained in part. On remand, the State may elect the offense or offenses upon which it wishes to proceed to sentencing. *See State v. Asefi*, 9th Dist. Summit No. 26430, 2012-Ohio-6101, ¶ 8.

III.

{¶31} Mr. Johnson's second assignment of error is sustained in part, and his first assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed in part and reversed in part, and the matter is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part,<br>
reversed in part,<br>
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____
EVE V. BELFANCE
FOR THE COURT

MOORE, P. J.
CARR, J.
CONCUR.

APPEARANCES:

CHRISTOPHER R. SNYDER, Attorney at Law, for Appellant.

RALPH M. RIVERA, Assistant Prosecuting Attorney, for Appellee.