[Cite as *State v. Maffei*, 2013-Ohio-5787.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | | C.A. No. 26686 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| JAMES G. MAFFEI | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 11 12 3468 |

DECISION AND JOURNAL ENTRY

Dated: December 31, 2013

BELFANCE, Presiding Judge.

{¶1} James Maffei appeals his convictions from the Summit County Court of Common Pleas. For the reasons set forth below, we affirm.

I.

{¶2} Mr. Maffei crashed his motorcycle in early August 2011. He woke up in the hospital to find Michelle Murphy in his room. She explained that she was looking for a place to live and offered to take care of Mr. Maffei during his recovery if she could stay in his house. Mr. Maffei agreed, and Ms. Murphy moved in.

{¶3} Ms. Murphy lived with Mr. Maffei until late November 2011 before getting her own place. Nevertheless, she would come over often to help Mr. Maffei dress and to otherwise help Mr. Maffei around his house. One of those times was December 10, 2011, a Saturday. Late that night or in the early morning of December 11, Ms. Murphy was cooking in the kitchen while Mr. Maffei sat at the dining room table with Glenn Lambert and Carissa Blouir, both of whom

Ms. Murphy knew. A fourth person, a man identified only as RP, also sat at the dining table. A heated argument erupted between Mr. Lambert and Mr. Maffei, and Mr. Maffei fired a shot into the floor. Mr. Lambert left at that time, and there was a dispute at trial as to whether Mr. Maffei fired at him while he left. Mr. Maffei left with RP soon after Mr. Lambert left while Ms. Blouir and Ms. Murphy stayed at the house.

{¶4} The following Monday evening, Ms. Blouir contacted the Summit County Sheriff's Department to report that she had been kidnapped by Mr. Maffei. Deputy Larry Brown interviewed Ms. Blouir; he also contacted Mr. Lambert after hearing Ms. Blouir's version of the events from a few nights earlier. Mr. Lambert corroborated Ms. Blouir's account, and Deputy Brown sought a warrant for Mr. Maffei's arrest.

{¶5} On Tuesday, December 13, 2011, the Sheriff Department SWAT team staged an early morning raid on Mr. Maffei's house. The SWAT team detonated two flashbangs prior to breaching the house and then entered, yelling that they were the Sheriff's Department. After clearing the downstairs of Mr. Maffei's home, the SWAT team proceeded up the stairwell. As Deputies Richard Wright and Mark Adams approached the top of the stairs, they heard a gunshot. Quickly moving to the top of the stairs, they found Mr. Maffei reaching into his closet. The deputies subdued Mr. Maffei and discovered Ms. Murphy hiding under the bed. They also discovered a firearm in the closet where Mr. Maffei had been and a spent casing nearby.

{¶6} Deputy Brown interviewed Ms. Murphy after the raid, and she told him that Mr. Maffei had driven her over to a house on Cormany Drive, which was nearby, and dumped trash bags into a dumpster behind the house. Ms. Murphy showed Deputy Brown the home, and he found two silver trash bags in the dumpster behind the house. Deputy Susan Barker came to the scene because Deputy Brown believed the trash bags to contain the remnants of a

methamphetamine lab. Deputy Barker examined the contents of the bags and discovered muriatic acid, batteries that had had the lithium removed, tubes, needles, mason jars, and bottles containing what she believed to be waste from a methamphetamine cook. Deputy Barker also found an empty Aleve cold medicine box and a receipt from Walgreens for the medicine. Deputy Barker went to Walgreens and looked at the database of people who had purchased the Aleve and similar products. Her research revealed that Mr. Maffei had purchased the Aleve cold medicine in question. A search of Mr. Maffei's house also uncovered two boxes of pseudoephedrine, which can also be used in manufacturing methamphetamine, in the rafters of the basement.

{¶7} Mr. Maffei was indicted for kidnapping, felonious assault, illegal manufacture of drugs, illegal assembly or possession of chemicals for the manufacture of drugs, having weapons while under disability, tampering with evidence, possessing criminal tools, and obstructing official business. The kidnapping and felonious assault charges all had firearm specifications as well, and a supplemental indictment added a peace-officer specification to one of the felonious assault counts.[1] A jury found Mr. Maffei not guilty of kidnapping, illegal manufacture of drugs, and obstructing official business but found him guilty of the remaining counts and their specifications. The trial court sentenced Mr. Maffei to an aggregate term of 27 years in prison.

{¶8} Mr. Maffei has appealed, raising five assignments of error for our review. For ease of discussion, we address his assignments of error out of order.

---

[1] The supplemental indictment also included forfeiture specifications related to the methamphetamine production, but those specifications were later dismissed.

II.

ASSIGNMENT OF ERROR II

THE JURY'S VERDICT ON FELONIOUS ASSAULT UNDER R.C. 2903.11 (COUNT 3) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE P[U]RSUANT TO THE OHIO CONSTITUTION, ARTICLE IV, SECTION III.

{¶9}    Mr. Maffei argues in his second assignment of error that his conviction for felonious assault against Mr. Lambert is against the manifest weight of the evidence.  We disagree.

{¶10}  In reviewing a challenge to the weight of the evidence, the appellate court

[m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶11}  Mr. Maffei was found guilty of violating R.C. 2903.11(A)(2), which provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."  "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist."  R.C. 2901.22(B).

{¶12}  All of the witnesses agreed that Mr. Lambert, Ms. Blouir, and Mr. Maffei were sitting at his dining room table with a man identified only as RP.  Ms. Murphy testified that she was in the kitchen while the other people were sitting at the table.  Ms. Murphy, Ms. Blouir, and Mr. Lambert all testified that an argument occurred between Mr. Lambert and Mr. Maffei about money, although there was some disagreement amongst the witnesses as to whom was supposed

to owe the other. In any case, the argument escalated, and Mr. Maffei fired a shot underneath the table. Mr. Lambert testified that he jumped up from the table and ran out of the house. Ms. Blouir also testified that Mr. Lambert ran out of the house but added that, as he did so, Mr. Maffei fired at least one more shot at Mr. Lambert. Ms. Murphy also testified that she heard two shots that night.

{¶13} Mr. Maffei testified that the argument that night was between Mr. Lambert and RP over a failed attempt to cook methamphetamine. Mr. Maffei also testified that Ms. Blouir was yelling at Mr. Lambert for not bringing her the methamphetamine he had promised to give her. According to Mr. Maffei, Ms. Blouir, Mr. Lambert, and RP were all talking over each other, arguing, and getting louder. RP turned to Mr. Maffei and said he was going to beat up Mr. Lambert. Mr. Maffei testified that he was tired of the arguments and was worried RP would hurt Mr. Lambert, so he pulled out his gun and shot a round into the floor to quiet everyone. After he had everyone's attention, Mr. Maffei reached out and touched the mason jar containing the waste from the production of methamphetamine that Mr. Lambert and RP were talking about and tapped it with the gun, saying that he was upset that they had brought it into his house. According to Mr. Maffei, when he tapped the mason jar, it broke, spilling the liquid over his table. Everyone at the table pushed away, and it was at that point that Mr. Lambert left. Mr. Maffei testified that Mr. Lambert did not rush out of the house because he had to stop at the door and undo two sets of locks before leaving. Mr. Maffei denied ever firing a shot at Mr. Lambert.

{¶14} Mr. Maffei argues that his conviction for felonious assault is against the manifest weight of the evidence because the evidence does not support the conclusion that Mr. Maffei caused or attempted to cause Mr. Lambert harm. He points to the fact that, while the police found the bullet Mr. Maffei fired into the floor, they never discovered a second bullet to

corroborate Ms. Murphy and Ms. Blouir's testimony about a second shot. Therefore, according to Mr. Maffei, it is more likely that his version of events, i.e. that he only fired the shot into the floor, is accurate. Furthermore, Mr. Maffei argues, if he had actually intended to harm Mr. Lambert, he could have easily done so since the men were mere feet apart from each other sitting at the table, making it unlikely that he would have waited until Mr. Lambert was trying to leave before firing a shot intended to harm him.

{¶15} Essentially, Mr. Maffei is arguing that the jury should have believed his testimony rather than that of Ms. Blouir and Ms. Murphy. However, a jury's verdict is not against the manifest weight of the evidence merely because it believed the State's witnesses rather than those of the defense. *State v. Brown*, 9th Dist. Summit No. 26490, 2013-Ohio-5112, ¶ 20. While it is true that Mr. Lambert, Ms. Blouir, and Ms. Murphy all admitted to regularly using methamphetamine around December 10, 2011, Mr. Maffei admitted to abusing prescription painkillers, and as this Court has often noted, the trier of fact is in the best position to judge credibility. *See, e.g., State v. Andrews*, 9th Dist. Summit No. 25114, 2010-Ohio-6126, ¶ 28. Furthermore, although the police never recovered evidence of the second bullet described by Ms. Blouir and Ms. Murphy, Ms. Blouir's testimony was that Mr. Maffei fired at Mr. Lambert while Mr. Lambert was running out the door, meaning the bullet could have easily gone through the doorway.

{¶16} Thus, after a thorough review of the record, we cannot conclude that the jury lost its way when it determined that Mr. Maffei had attempted to harm Mr. Lambert with his firearm and, therefore, committed felonious assault against Mr. Lambert. Accordingly, Mr. Maffei's second assignment of error is overruled.

ASSIGNMENT OF ERROR III

THE JURY'S VERDICT ON TAMPERING WITH EVIDENCE UNDER R.C. 2921.12 (COUNT 7) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE P[U]RSUANT TO THE OHIO CONSTITUTION, ARTICLE IV SECTION III.

{¶17} In Mr. Maffei's third assignment of error, he argues that his conviction for tampering with evidence is against the manifest weight of the evidence. We disagree.

{¶18} "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" R.C. 2921.12(A)(1). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶19} We initially note that the State presented alternative theories about which of Mr. Maffei's actions constituted tampering with evidence. The State's theory at the beginning of trial was that Mr. Maffei had tampered with evidence by disposing of the waste from the methamphetamine lab that Deputies Brown and Barker discovered in the dumpster behind the house on Cormany Drive, and Mr. Maffei's arguments on appeal focus solely on that theory. However, Mr. Maffei testified at trial that, after the incident with Mr. Lambert, he took his gun to RP's garage. The State argued during closing that Mr. Lambert's moving of the gun from the house also constituted tampering with evidence. Indeed, Mr. Maffei testified that he went to RP's garage to hide the gun there so the police would not find it when they responded to the sound of gunfire. Although RP brought the gun back to Mr. Maffei's house a short while later, Mr. Maffei still admitted during his testimony that he assumed there would be an investigation

and removed the firearm from his house, intending to impair its availability as evidence in the investigation. Thus, Mr. Maffei admitted to tampering with evidence.

{¶20} Accordingly, in light of Mr. Maffei's admission, we cannot conclude that the jury lost its way in finding that Mr. Maffei had committed tampering with evidence. His third assignment of error is overruled.

ASSIGNMENT OF ERROR I

THE JURY'S GUILTY VERDICT ON FELONIOUS ASSAULT UNDER R.C. 2903.11 (COUNT 2) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE P[U]RSUANT TO THE OHIO CONSTITUTION, ARTICLE IV, SECTION III.

{¶21} Mr. Maffei argues in his first assignment of error that his conviction for felonious assault against Deputy Wright or Deputy Adams is against the manifest weight of the evidence because he did not intend to fire the gun at the officers.

{¶22} As with his other felonious assault conviction, Mr. Maffei was found guilty of violating R.C. 2903.11(A)(2), which provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶23} The incident that formed the basis for this felonious assault conviction occurred on the morning of December 13, 2011. The night before, Deputy Brown of the Summit County Sheriff's Department Detective Bureau spoke with Ms. Blouir, who reported having been kidnapped by Mr. Maffei. She told him to speak to Mr. Lambert, which he did, and, according to Deputy Brown, Mr. Lambert corroborated much of Ms. Blouir's story. Based on the information he had received, Deputy Brown sought and received a warrant for Mr. Maffei's arrest. Deputy Brown decided, based on his understanding that Mr. Maffei was armed and had apparently shot

at Mr. Lambert a few days earlier, that it would be prudent to utilize the Sheriff Department's SWAT team, of which he was also a member.

{¶24} Early in the morning of December 13, 2011, the SWAT team gathered near Mr. Maffei's home. Because they believed there was a potential methamphetamine lab inside, the SWAT team detonated two flashbang grenades outside, rather than inside, the house immediately prior to breaching. The main entry team entered through the back door of Mr. Maffei's home, announcing that they were the Sheriff's Department, and cleared the downstairs.

{¶25} After clearing the first floor, the team lined up by the steps leading to the second floor. Deputy Richard Wright testified that he was leading the team up the steps when he heard a gunshot, causing him to pause to make sure another SWAT member was behind him. He then continued to the top of the stairs and proceeded to the right. He saw a bathroom in front of him and saw a person in his peripheral vision, who turned out to be Mr. Maffei. Mr. Maffei appeared to be reaching into a closet.

{¶26} Deputy Mark Adams also testified that he was a member of the SWAT team that entered Mr. Maffei's home and that the officers entered Mr. Maffei's home and announced their presence. After clearing the downstairs, Deputy Wright and Deputy Adams started going up the stairs. When he was on the steps, Deputy Adams heard a gunshot. He and Deputy Wright proceeded to the top of the stairs and turned right. They observed Mr. Maffei pulling his hand out of his bedroom closet. When they ordered Mr. Maffei to get on the ground, he did not comply, but he did open his hands to show that they were empty. Deputy Adams took him to the ground and held him. Deputy Adams observed a firearm in the closet and a shotgun in the bedroom. The SWAT team also found Ms. Murphy hiding under the bed.

**{¶27}** According to Ms. Murphy, she heard the SWAT team approaching the house and woke up Mr. Maffei. She heard a big bang and people yelling "'Sheriffs[.]" Ms. Murphy testified that, after she heard the men announce that they were the Sheriff's Department, Mr. Maffei grabbed his pistol, which was on an end table by the bed, and shot at the SWAT team while they were walking up the stairs.

**{¶28}** Detective Jason Kline testified that the Sheriff's Department recovered a spent 9 mm casing from the bathroom in Mr. Maffei's house. He also testified that a gunshot residue test came back positive for a sample taken from Mr. Maffei's hands. Following the shooting in Mr. Maffei's house, Detective Kline discovered a hole in the stairwell wall that appeared to have been fresh. The hole was at shoulder height for a person ascending the stairs, and Detective Kline believed that it was the hole made by the bullet fired during the SWAT raid. However, despite the tearing out the wall to search for the bullet, no bullet was ever recovered.

**{¶29}** Mr. Maffei does not dispute that a shot was fired during the SWAT team raid on December 13, 2011. However, Mr. Maffei testified that it was completely accidental. According to Mr. Maffei, he woke up to Ms. Murphy screaming and described the house as shaking. He jumped out of his bed and grabbed the pistol from his nightstand. The gun fired, and Mr. Maffei fell because he had not grabbed his cane. Mr. Maffei asserted that the gun had gone off because he had fumbled it due to just waking up, having taken pain pills, and his physical condition. Mr. Maffei testified that, once he heard someone yell "'Shots fired[,]'" he realized that it was the police. Mr. Maffei asserted that he had fallen at the foot of his bed and was pulling himself up on to his bed when the police entered the bedroom. He denied that he had put the gun in the closet.

{¶30} Mr. Maffei argues that the jury lost its way in determining that he had intentionally shot at the SWAT team. However, Ms. Murphy testified that she saw Mr. Maffei intentionally shoot at the officers after they had announced that they were the Sheriff's Department. Furthermore, Mr. Maffei testified that he dropped the gun as he fell to the floor and that he had no idea where the gun went. However, Deputies Wright and Adams testified that they found Mr. Maffei reaching into the closet where they eventually found the gun, not lifting himself up at the end of the bed as he had testified. Additionally, while Mr. Maffei talked at great lengths about the injuries he had suffered in the motorcycle accident, he admitted at trial that he had managed to successfully fire the gun just a few days earlier, which could have been seen by the jury as undermining Mr. Maffei's claims that he accidentally fired the gun.

{¶31} After a thorough review of the record, we cannot conclude that the jury lost its way and committed a manifest miscarriage of justice when it found Mr. Maffei guilty of knowingly attempting to harm police officers with a firearm. Mr. Maffei's first assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT VIOLATED MR. MAFFEI'S DOUBLE JEOPARDY RIGHT AS PROTECTED BY THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION, ARTICLE I, SECTION X WHEN IT FAILED TO MERGE THE ALLIED OFFENSES OF COUNTS 2 AND 6 PURSUANT TO R.C. 2941.25 AND SENTENCED MR. MAFFEI ON EACH OFFENSE.

{¶32} Mr. Maffei argues in his fourth assignment of error that his convictions for felonious assault and having a weapon under disability should merge for purposes of sentencing because they are allied offenses of similar import. We disagree.

{¶33} R.C. 2941.25 provides,

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

"Thus, two or more offenses arising from the same conduct and similar import only may result in one conviction." *State v. Hayes*, 9th Dist. Summit No. 26388, 2013-Ohio-2429, ¶ 31. "Two or more offenses may result in multiple convictions, however, if: (1) they are offenses of dissimilar import; (2) they are separately committed; or (3) the defendant possesses a separate animus as to each." *Id.*

{¶34} Whether an offender's sentences should merge is a two-part test. "The first prong looks to the import of the offenses and requires a comparison of their elements." *State v. Washington*, Slip Opinion No. 2013-Ohio-4982, ¶ 13, citing *State v. Mitchell*, 6 Ohio St.3d 416, 418 (1983). "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, syllabus. A plurality of the Court in *Johnson* set forth the standard as being "whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other[,]" (Emphasis original.) *id.* at ¶ 48, while Justice O'Connor asserted in her concurring opinion that offenses are allied "when their elements align to such a degree that commission of one offense would probably result in the commission of the other offense." *Id.* at ¶ 66 (O'Connor, J., concurring in judgment.). If the offenses are of similar import, then "a court must review the entire record, including arguments and information presented at the sentencing hearing, to

determine whether the offenses were committed separately or with a separate animus." *Washington* at syllabus. "If the offenses were committed by the same conduct and with a single animus, the offenses merge." *Id.* at ¶ 13, citing *State v. Mitchell*, 6 Ohio St.3d 416, 418 (1983).

{¶35} The jury found Mr. Maffei guilty of violating R.C. 2923.13(A)(2)/(A)(3) by having weapons while under disability and R.C. 2903.11 by committing felonious assault. R.C. 2923.13(A)(2), (3) provides,

> Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence or * * * [t]he person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse * * *.

R.C. 2903.11(A)(2) provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." It is certainly true that an offender *could* commit felonious assault under R.C. 2903.11(A)(2) and have a weapon while under disability pursuant to R.C. 2923.13(A)(2) or (3) with the same action. Thus, the question is whether Mr. Maffei actually did commit both crimes with the same conduct and animus.

{¶36} Ms. Murphy and Mr. Maffei both testified that he had kept the gun at issue in his house for a significant period of time. Ms. Murphy testified that he would often have the gun on him when he was in the house. Mr. Maffei and Ms. Murphy also testified that, on the morning of the police raid, Mr. Maffei had the gun nearby where he was sleeping. While Mr. Maffei argues that, only when he picked the gun up to fire at the officers, did he violate R.C. 2923.13(A)(2) or (3), it is clear from his testimony and that of Ms. Murphy that he had "acquire[d], ha[d] [or] carr[ied]" the gun prior to the police entering his home. R.C. 2923.13(A). Given the length of

time Mr. Maffei had owned the firearm and that there is no indication that he intended to use it to harm the police prior to them entering his home, we cannot conclude that his animus for violating R.C. 2923.13(A)(2) or (3) was the same as the animus he displayed when he actually fired the gun at the officers. *Compare with State v. Fairman*, 2d Dist. Montgomery No. 24299, 2011-Ohio-6489, ¶ 67 (concluding that the offender's convictions for having a weapon under disability and felonious assault merged when the same weapon was used to commit both and there was evidence that the offender had "obtained the gun with the immediate intent of shooting" the victim).

{¶37} Furthermore, in addition to the handgun used in the felonious assault, Mr. Maffei also had a shotgun in his home, the possession of which violated R.C. 2923.13(A)(2) and (3) as well. Assuming the shotgun formed the basis of the jury's determination that Mr. Maffei had a weapon under disability, since the shotgun was not used in the felonious assault, the convictions would not be allied. *See Fairman* at ¶ 67. Accordingly, Mr. Maffei's convictions for felonious assault and having a weapon under disability are not allied offenses of similar import and do not merge.

{¶38} Mr. Maffei's fourth assignment of error is overruled.

ASSIGNMENT OF ERROR V

THE TRIAL COURT VIOLATED MR. MAFFEI'S DOUBLE JEOPARDY RIGHT AS PROTECTED BY THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION, ARTICLE I, SECTION X WHEN IT FAILED TO MERGE THE ALLIED OFFENSES OF COUNTS 5 AND 8 PURSUANT TO R.C. 2941.25 AND SENTENCED MR. MAFFEI ON EACH OFFENSE.

{¶39} In Mr. Maffei's fifth assignment of error, he argues that his convictions for illegal possession of chemicals and possession of criminal tools should merge for purposes of sentencing. We disagree.

{¶40}  R.C 2925.041(A) provides that "[n]o person shall knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II in violation of section 2925.04 of the Revised Code."  R.C. 2923.24(A) provides that "[n]o person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally."  As noted above, the first prong in the allied offense analysis is whether the offenses could be committed with the same conduct.  We conclude that R.C. 2925.041(A) and R.C. 2923.24(A) could be committed with the same product since a person could possess a chemical, which would be a substance under R.C. 2923.24, with the purpose to use it for the manufacture of a controlled schedule I or schedule II substance.  Thus, the question again is whether Mr. Maffei actually did commit both crimes with the same conduct and the same animus.

{¶41}  There was extensive evidence that, if believed, supported a finding that Mr. Maffei possessed criminal tools and had committed illegal assembly.  Ms. Murphy testified that Mr. Maffei had taken trash bags to a dumpster behind a nearby home on Cormany Drive.  Deputy Brown testified that Ms. Murphy showed him where the dumpster was and he discovered trash bags inside.  Deputy Brown showed Deputy Barker the two trash bags he had found in the dumpster.  Deputy Barker testified that she discovered a muriatic acid bottle and a bottle she recognized as having been used to actually cook the methamphetamine in the dumpster.  At the bottom of the bottle, she saw waste from the production of methamphetamine.  Deputy Barker also observed empty packaging for Aleve cold medicine, mason jars, needles, and batteries that had had lithium removed.  According to Deputy Barker, the items she observed in the dumpster were evidence of a methamphetamine lab.

{¶42} Deputy Barker also found a receipt for the Aleve cold medicine in the trash bags. Upon investigation, Deputy Barker learned that Mr. Maffei had purchased the cold medicine. Detective Kline testified that a second search of Mr. Maffei's house uncovered two packages of pseudoephedrine, which could be used in the production of methamphetamine, hidden behind the insulation in the rafters of Mr. Maffei's basement.

{¶43} Mr. Maffei argues that he committed both offenses with the same conduct. "'In addition to the requirement of similar import of the crimes committed, the defendant, in order to obtain the protection of R.C. 2941.25(A), *must show that the prosecution has relied upon the same conduct to support both offenses charged*.'" (Emphasis added in *Cooper*.) *State v. Cooper*, 104 Ohio St.3d 293, 2004-Ohio-6553, ¶ 17, quoting *State v. Logan*, 60 Ohio St.2d 126, 128 (1979). The State presented evidence of separate conduct with respect to the charged offenses, i.e. possession of the materials found in the dumpster and the possession of the pseudoephedrine found in the basement. From this, the jury could have concluded that the items in the dumpster constituted the criminal tools while Mr. Maffei's possession of the pseudoephedrine in the basement constituted the conduct satisfying the illegal assembly/possession of chemicals under R.C. 2925.041(A). However, Mr. Maffei does not explain how the possession of the pseudoephedrine in the basement and his previous possession of the methamphetamine lab and materials would be subject to merger; instead, he bases his argument on the incorrect premise that the jury had to use either the pseudoephedrine in the basement as the basis for both findings of guilt or that it had used the items found in the dumpster as the basis of finding him guilty of illegal assembly and possession of criminal tools. Thus, given the evidence at trial and Mr. Maffei's limited appellate arguments, we cannot conclude that the State used the same conduct to support both offenses charged. *See Cooper* at ¶ 17, ¶ 28.

**{¶44}** Accordingly, Mr. Maffei's fifth assignment of error is overruled.

### III.

**{¶45}** Mr. Maffei's assignments of error are overruled, and the judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

WHITMORE, J.
CONCURS.

CARR, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

LORI CURD, Appellate Review Office, School of Law, The University of Akron, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.