[Cite as *State v. Ramey*, 2015-Ohio-5389.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 2014-CA-127 |
| | : | |
| v. | : | Trial Court Case No. 2014-CR-415 |
| | : | |
| CAMERON RAMEY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of December, 2015.

. . . . . . . . . .

RYAN A. SAUNDERS, Atty. Reg. No. 0091678, Assistant Clark County Prosecuting Attorney, 50 East Columbia Street, Fourth Floor, Springfield, Ohio 45502
    *Attorney for Plaintiff-Appellee*

JON PAUL RION, Atty. Reg. No. 0067020, NICOLE RUTTER-HIRTH, Atty. Reg. No. 0081004, P.O. Box 10126, Dayton, Ohio 45402
    *Attorneys for Defendant-Appellant*

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Cameron Ramey, appeals from his conviction and sentence in the Clark County Court of Common Pleas after a jury found him guilty of complicity to improperly discharging a firearm at or into a habitation, complicity to felonious assault, improperly handling a firearm in a motor vehicle, and tampering with evidence.   In support of his appeal, Ramey contends he did not receive a fair trial due to improper statements made by the State during its closing argument.   He also contends his conviction for complicity to improperly discharging a firearm and complicity to felonious assault was not supported by sufficient evidence and was against the manifest weight of the evidence.   In addition, Ramey claims the trial court erred in imposing an aggregate 16-year prison term.   For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2}   On June 23, 2014, Ramey was indicted on one count of complicity to improperly discharging a firearm at or into a habitation in violation of R.C. 2923.03(A)(2) and R.C. 2923.161(A)(1), a felony of the second degree; one count of complicity to felonious assault in violation of R.C. 2923.03(A)(2) and R.C. 2903.11(A)(2), a felony of the second degree; one count of improperly handling a firearm in a motor vehicle in violation of R.C. 2923.16(B), a felony of the fourth degree; and tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree.   The two charges for complicity each included two firearm specifications and the tampering with evidence charge included a single firearm specification as well.

{¶ 3} The foregoing charges stemmed from Ramey's alleged involvement in a drive-by shooting that took place on June 12, 2014, at a residence located on 1871 Lincoln Park South in the city of Springfield, Clark County, Ohio.   Ramey pled not guilty to all charges and the matter proceeded to a three-day jury trial.   The State called various witnesses at trial, including the inhabitants of the residence that was the target of the shooting, Delana Dixon and her son, Anthony "A.J." Walker.   The State also called Dixon and Walker's neighbors, Brian McCarty and Sherry Miller, as well as the investigating officers, Eric Flemming, Jeffrey Steinmetz, and Detective Dan Dewine. The State further presented testimony from crime lab experts Tim Shepard and Katherine Hall.   Ramey and his mother, Stephanie Freeman, testified in Ramey's defense.   The following information was elicited at trial.

*Feud Over Wellington Shooting*

{¶ 4} In April 2014, Walker's best friend, Jeff Wellington, was shot and killed.   The shooter was allegedly an individual named Tyrin Hawkins, who was charged with killing Wellington.   Detective Dewine of the Springfield Police Department testified that he investigated the Wellington shooting and noted that it had caused a rift between two groups of youths that resulted in several other shooting incidents in Springfield, Ohio.

{¶ 5} Walker specifically testified that his group of friends had problems with Ramey and his group of friends during the spring and summer of 2014.   Ramey also testified that the Wellington shooting caused problems between his and Walker's group of friends.   According to Ramey, Walker's group of friends includes Destiny Sudberry and Robert Smith, while his group of friends includes Deaerius McWhorter, Shyheim Gibson, William Stroder, Paris Wayne, and Gary Cameron.   Ramey testified that he used

to hang out with Hawkins and that Stroder and Gibson had remained friends with Hawkins after Wellington's death. Ramey also testified that his group of friends identify themselves with a specific emoji icon when communicating on Twitter. The emoji is an image of the number 100 underlined. Ramey further indicated that Walker's group of friends identify themselves as "ABE."

*Memorial Day Shooting*

{¶ 6} On Memorial Day 2014, a bullet ricocheted off Ramey's head while he was riding as a passenger in a vehicle driving by Destiny Sudberry's residence. Detective Dewine, who also investigated that incident, testified that Ramey was in the vehicle with Wayne, Stroder, and Gibson during the shooting. Dewine testified that he interviewed Ramey and Ramey told him that Walker, Smith, Sudberry, and another female were on Sudberry's front porch when the shots were fired. According to Dewine, Ramey never told authorities who shot him, but that Ramey indicated that he thought he saw Walker with a gun. Although Ramey never confirmed the identity of the shooter during the investigation, at trial, Ramey testified that it was indeed Walker who had fired the shot that struck him in the head.

*June 12, 2014 Drive-By Shooting*

{¶ 7} On June 12, 2014, at approximately 8:30 p.m., just sixteen days after Ramey had been struck by a bullet, a drive-by shooting took place at Walker's residence where he lives with his mother Delana Dixon. Earlier on the same day, at 12:33 p.m., Ramey posted a message on his Twitter account saying: "Shoot me again try yo luck n[***]a SIKE cuss yo tail is tucked bitch. 100." Trial Trans. Vol. II (Oct. 7, 2014), p. 327, 515-516.

{¶ 8} Dixon testified that around 2:00 p.m. she saw Ramey, Deaerius McWhorter,

William Stroder, and three other males standing outside Ramey's house as she was coming home from work. There is no dispute that Ramey lived near Dixon and Walker at a residence on Clifton Avenue. Dixon also testified that she saw Ramey's green SUV drive by her residence at approximately 5:00 p.m. In addition, Walker testified that he saw Ramey's green SUV drive by their residence twice on the day of the shooting. According to Walker, the second time Ramey drove by was only 45 minutes to an hour before the shooting at issue occurred. There is no dispute that Ramey drives a green SUV that is owned by his mother, Stephanie Freeman.

{¶ 9} Walker testified that just prior to the shooting, he was talking on his cell phone while sitting on a green electrical box that was located in a parking lot next to his house. As he was sitting and talking, he saw a white car turn onto his street with a green SUV following closely behind. According to Walker, the vehicles were moving almost bumper to bumper. Walker testified that he recognized the SUV as belonging to Ramey. When he recognized Ramey's vehicle, Walker testified that he ran back to his house. Walker claimed that his mom had opened the front door leading out to the front porch as he was running toward the house. As he approached the porch, his mom asked him why he was running. Walker then testified that he heard gunshots and ran into his mother on the front porch. According to Walker, his mother screamed "somebody's shooting out that white car." Trial Trans. Vol. II (Oct. 7, 2014), p. 338. Walker claimed he did not recognize the white car nor see who was driving it because the windows were heavily tinted. However, Walker testified that he could see Ramey was driving the green SUV and that Deaerius McWhorter was riding as passenger.

{¶ 10} Dixon testified that just prior to the shooting, she went outside to check on

Walker. She claimed that when she got to the front porch, she saw Walker running towards the house. She testified that she asked him why he was running and then heard gunshots. Dixon claimed that she saw the gunshots come from a white car as it was driving by. She testified that the windows of the white car were cracked so she could only see the arm of the driver sticking out. She never saw a green SUV and she testified that one of the bullets just missed her and Walker.

{¶ 11} Dixon further testified that she immediately called 9-1-1 to report the shooting. The recorded 9-1-1 call was then played for the jury and admitted into evidence. During the call, Dixon provided the names of two suspects who were given to her by Walker. Specifically, Dixon provided the names Cameron Ramey and Akeem Freeman. It is undisputed that Freeman is Ramey's cousin. Walker testified that he gave his mother those names because he saw Ramey in the green SUV, and his friend, who was on the phone with him at the time of the shooting, informed him that Freeman drove a white car.

{¶ 12} Walker and Dixon's neighbor who lived across the street, Brian McCarty, testified that on the night in question, he heard gunshots and saw a green SUV in front of Walker and Dixon's house as the gunshots were going off. McCarty claimed that the green SUV was moving really slow until the shots stopped. Once the shots stopped, McCarty saw the SUV speed away. McCarty testified that he called 9-1-1 as the shooting took place. McCarty's 9-1-1 call was also played for the jury and admitted into evidence. During the call, McCarty advised the operator that the green SUV was driving towards Johnson Street and noted that it had turned right. McCarty never saw a white vehicle and did not recognize or see anyone in the green SUV.

{¶ 13} McCarty's fiancé, Sherry Miller, was with McCarty when the gunshots were fired. Miller testified that she looked out the window and saw a green jeep and a tan or light colored car. Sherry could not remember which vehicle was in front, but she recalled the vehicles were close together, noting that they were clearly moving together. After the shots were fired, Miller testified that the vehicles went to the corner of the street and then turned right together. However, Miller testified that she could not see which of the two vehicles the shots came from, and could not identify anyone in either vehicle.

*Investigation of Drive-By Shooting*

{¶ 14} Officer Eric Flemming of the Springfield Police Department testified that he was dispatched to 1871 Lincoln Park South on June 12, 2014, to investigate a report of shots fired. He was advised that a white car and green SUV were the suspect vehicles. When he arrived at the scene, Flemming came into contact with Walker and his mother, and was advised that Cameron Ramey and Shyheim Gibson were possible suspects. Flemming testified that he walked around the house to look for evidence and observed two bullet holes underneath the front windows of the house and one bullet hole in the area of the front porch. After speaking to the witnesses and examining the scene, Flemming testified that he went to a few addresses where Walker and Dixon advised the suspects might be located.

{¶ 15} Initially, Flemming did not find any vehicles matching the description of the suspect vehicles. However, a few hours later, Flemming received a dispatch advising him that one of the suspect vehicles was on Delta Road. Flemming testified that he spotted a green SUV matching the description of the suspect vehicle at an apartment complex on Delta Road. He ran the license plate number and the owner was shown as

Stephanie Freeman, Ramey's mother. He then saw two individuals approach the green SUV and drive away. Flemming followed the SUV and made contact with the occupants of the vehicle when they stopped at a nearby gas station.

{¶ 16} Flemming testified that the driver of the SUV identified himself as Cameron Ramey and provided his identification information. Flemming also identified Ramey's passenger as Deaerius McWhorter. According to Flemming, Ramey advised him that he was out celebrating his high school graduation. Flemming testified that he told Ramey his vehicle was a suspect vehicle in a crime and asked if Ramey had any weapons or contraband in the vehicle, to which Ramey responded he did not. Flemming then asked if he could search Ramey's vehicle and Ramey answered affirmatively.

{¶ 17} After obtaining Ramey's consent, Flemming proceeded to search Ramey's vehicle. Flemming testified that he discovered a loaded handgun in the glove box, which was unlocked. When Flemming asked Ramey about the gun, Ramey claimed he knew nothing about it. Flemming then testified that Ramey proceeded to tell him that the SUV belonged to his mother and explained that the gun might be hers. In response, Flemming claimed he called Ramey's mother, and based on their conversation, he detained Ramey. According to Flemming, Ramey's phone was taken at police headquarters and Ramey signed a consent form agreeing to a search of his cell phone.

{¶ 18} Detective Dan Dewine testified that he interviewed Ramey at police headquarters and that the interview was recorded. The recorded interview was played for the jury and admitted into evidence. During the interview, Ramey told Dewine that he did not know anything about the shooting at Walker's house until he heard about it later that night. Ramey claimed he was at his high school graduation until 8:00 or 8:30

p.m. Ramey told Dewine that he went back to his house after graduation and then left shortly thereafter to visit his cousin. Ramey gave Dewine no timeframe for his departure. Ramey then claimed that at some point in the night he met up with an individual named Kyle Webster. Ramey told Dewine that the handgun in his glove box belonged to Webster and that Webster had given him the gun that night. Ramey also told Dewine that he had put the gun in the glove box for Webster. He claimed the glove box was locked and that he gave Officer Flemming a key to open it because he forgot the gun was in there. After further investigation, Dewine testified that he learned Webster had been incarcerated in the Clark County Jail on June 12, 2014, and thus could not have given Ramey the gun as he alleged.

{¶ 19} The day after the shooting, Officer Jeffrey Steinmetz, an evidence collection and processing specialist, went to the crime scene to collect further evidence. In examining the front of the residence, Steinmetz observed four bullet holes. He observed one bullet hole below the residence's north-most-front window, two bullet holes below the south-most-front window, and one bullet hole in the area of the front porch near the front door. Steinmetz collected the bullets and bullet fragments that he could find and measured their trajectory. He testified that the bullet hole under the north-most-front window was approximately seven inches from the ground and the two bullet holes underneath the southern-most window were just slightly higher. Steinmetz took pictures of the exterior of the residence showing where the bullet holes were located and those photos were admitted into evidence.

{¶ 20} Tim Shepard of the Springfield Police Crime Laboratory testified that he completed testing to determine whether the bullets fired at Walker and Dixon's residence

came from the firearm that was discovered in Ramey's glove box. Shepard testified that he compared a portion of the bullets that were collected from the residence with test shot bullets from the firearm found in Ramey's vehicle. From this comparison, Shepard found a match and concluded that the gun found in Ramey's glove box was the only weapon that could have fired the bullets recovered from the crime scene.

{¶ 21} Katherine Hall of the Ohio Bureau of Criminal Investigations testified that she tested Ramey's DNA to determine whether it matched swabs taken from the handgun found in his vehicle. Hall's test results lead her to conclude that Ramey's DNA was not on the handgun's trigger, but her results could not conclusively determine whether Ramey's DNA was on the handle. The parties stipulated that test results from a gunshot residue analysis concluded that no gunshot residue was found on Ramey's person.

*Ramey and His Mother's Testimony*

{¶ 22} In his defense, Ramey testified that on the night of the shooting, he left his house in his mother's green SUV after attending his high school graduation and then ran into his cousin, Akeem Freeman, who happened to be driving by. Ramey claims that Freeman, who drove a white car, rolled down his window and told him to follow him. Ramey testified that he thought Freeman was driving back to his house so they could ride together. However, Ramey testified Freeman instead drove by Walker's house, slowed down, and fired gunshots at the residence.

{¶ 23} Ramey testified that after the shots were fired, Freeman turned left on Johnson Street. Ramey claimed that he went the opposite direction on Johnson Street and then went to get something to eat. After he got something to eat, Ramey testified that Freeman called him and told him to pick him up. Ramey testified that he picked

Freeman up at his house and that Freeman put the gun in his glove box. According to Ramey, Freeman said that he should have hit Walker.

{¶ 24} Ramey then testified that he drove Freeman to Freeman's sister's house where they hung out and met up with Deaerius McWhorter. After hanging out at Freeman's sister's house, Ramey claimed that he and McWhorter took Freeman home and then went to a gas station where they were stopped by an officer. However, Ramey claimed McWhorter was not with him during the shooting.

{¶ 25} Continuing, Ramey testified that he did not know Freeman was going to fire shots at Walker's house and that he did not encourage or assist him in doing so. He also testified that the message he sent on Twitter on the day of the shooting was not meant for anyone, but was merely a song lyric. Ramey, however, freely admitted to lying to Detective Dewine and Officer Flemming throughout the course of the investigation, as well as lying to Dewine during the investigation of the Memorial Day shooting.

{¶ 26} Ramey's mother, Stephanie Freeman, testified that she received a telephone call from Officer Flemming on the night of the shooting. She testified that the officer asked if she had kept a weapon in her vehicle, to which she responded that she did not. She claimed they were at Ramey's graduation ceremony until around 8:00 p.m. and that when they returned home Ramey took her green SUV to go out and celebrate.

{¶ 27} On cross-examination Ramey's mother admitted that she had problems with Ramey and his friends. She was asked about a text message she sent to Ramey in which she wrote in part: "Get that Goddamn gun out of my house and all your f****** friends right now before I come home." Trial Trans. Vol. II (Oct. 7, 2014), p. 471. According to Ms. Freeman, she was referring to an air gun, but she admitted that she was

afraid that her son was going to end up in prison or dead based on his conduct.

{¶ 28} After hearing all the testimony and evidence, the jury found Ramey guilty of all four charges against him, including the firearm specification that was attached to the tampering with evidence charge. Following his conviction, the trial court sentenced Ramey to three years in prison for complicity to improperly discharging a firearm, eight years in prison for complicity to felonious assault, one year in prison for improperly handling a firearm in a motor vehicle, three years in prison for tampering with evidence, and one year in prison for the accompanying firearm specification. The trial court ordered all of Ramey's prison terms to be served consecutively for a total prison term of 16 years.

{¶ 29} Ramey now appeals from his conviction and sentence, raising four assignments of error for review.

**First Assignment of Error**

{¶ 30} Ramey's First Assignment of Error is as follows:

THE REMARKS OF THE PROSECUTOR DURING CLOSING ARGUMENT WERE IMPROPER AND SO INFLAMMATORY THAT RAMEY WAS DENIED A FAIR TRIAL.

{¶ 31} Under his First Assignment of Error, Ramey contends the State engaged in prosecutorial misconduct by making several improper comments during closing argument that deprived him of a fair trial. We disagree.

{¶ 32} Before addressing each allegation of misconduct, we note that prosecutors are generally "entitled to considerable latitude in opening and closing arguments."

(Citations omitted.) *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 12. "A prosecutor may freely comment in closing argument on what the evidence has shown and what reasonable inferences the prosecutor believes may be drawn therefrom." (Citation omitted.) *Id.* We review allegations of prosecutorial misconduct in the context of the entire trial. (Citation omitted.) *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42.

{¶ 33} Our review of prosecutorial misconduct claims focuses on whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant. (Citation omitted.) *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. (Citation omitted.) *State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21.

{¶ 34} Ramey first claims the prosecutor's comments at closing were improper because they characterized him as a liar who fabricated his version of what occurred on the night of the shooting at Walker's residence. However, as this court stated in *State v. Baker*, 159 Ohio App.3d 462, 2005-Ohio-45, 824 N.E.2d 162 (2d Dist.):

It is not prosecutorial misconduct to characterize a witness as a liar or a claim as a lie if the evidence reasonably supports the characterization. * * * However, prosecutors may not invade the realm of the jury by, for example,

> stating their personal beliefs regarding guilt and credibility, or alluding to matters outside the record. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883.

*Baker* at ¶ 19.

{¶ 35} At trial, Ramey admitted that he lied to Detective Dewine on numerous occasions throughout the investigation of the shooting at Walker's residence. Specifically, Ramey admitted that he lied when he told Dewine that the firearm in his SUV belonged to Kyle Webster. He also admitted that he lied when he told Dewine the glove box containing the firearm was locked. Ramey again admitted to lying to Dewine when he gave the detective his incorrect Twitter account username. Ramey also admitted that he lied to the police during the investigation of the Memorial Day shooting when he told them he did not know who shot him. His recorded interview with Dewine also clearly establishes that he told the detective a completely different version of events than what he testified to at trial. Accordingly, the evidence reasonably supports the prosecutor's characterization of Ramey as a liar. Thus, the comments regarding Ramey's veracity were not inappropriate.

{¶ 36} Ramey next claims the prosecutor improperly commented on the fact that he never reached out to law enforcement to tell the version of events that he ultimately relayed at trial. However, this too was supported by Ramey's own testimony, as Ramey admitted that he did not "come clean" and tell what he alleges really happened with regards to the drive-by shooting until the day of trial. Therefore, these comments made by the prosecutor were likewise not inappropriate as they were supported by the evidence.

{¶ 37} Ramey further argues the prosecutor improperly stated he was in the "catbird seat" since he adjusted his story of what happened based on what he saw and heard throughout the course of the investigation. Again, the prosecutor's comment was supported by the evidence, as the testimony from Dewine, Flemming, and Ramey himself establishes that Ramey changed many aspects of his story multiple times throughout the investigation and also told a completely different version of events at trial. In fact, Ramey freely admitted on the record that he did not tell his alleged true version of events until after having received all the State's discovery and after hearing all the State's witness testify against him at trial. Accordingly, we fail to see how the prosecutor's comment was improper, as it was also supported by the evidence.

{¶ 38} Next, Ramey contends the prosecutor improperly made personal observations about Ramey and Walker's credibility, essentially telling the jury that Walker's testimony was more credible. As previously noted, a prosecutor should not express his personal belief or opinion on the credibility of a witness during closing argument. (Citations omitted.) *State v. Jones*, 2d Dist. Montgomery No. 18789, 2002 WL 538885, *4 (Apr. 12, 2001). However, "[t]he prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument." (Citation omitted.) *State v. Treesh,* 90 Ohio St.3d 460, 466, 739 N.E.2d 749 (2001). Further, "[t]he prosecutor may comment fairly on the credibility of witnesses based on their in-court testimony, or may even suggest to a jury that the evidence demonstrated that the witness was lying." (Citations omitted.) *Jones* at *4.

{¶ 39} Under the circumstances of this case, we do not find the comments made regarding Ramey's credibility were improper given his admitted track record of lying.

Furthermore, even if the prosecutor did improperly express a personal belief that Walker was more credible than Ramey, we do not find that the comment affected the outcome of trial. For a comment to warrant reversal on grounds of prejudice, the remarks must be "so inflammatory as to render the jury's decision a product solely of passion and prejudice against the appellant." (Citation omitted.) *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986). That is simply not the case here.

{¶ 40} Ramey also argues that the prosecutor misstated the evidence during closing statements. Ramey first takes issue with the prosecutor's comment that defense counsel had characterized the drive-by shooting as a so-called "graduation joke." The record indicates that defense counsel did indeed make that characterization during his opening statement. Regardless, comments made during opening and closing statements are not evidence for the jury to consider. *State v. Frazier*, 73 Ohio St.3d 323, 338, 652 N.E.2d 1000 (1995). Since the trial court properly instructed the jury that opening and closing statements are not to be considered as evidence, we must presume that the jury followed the court's instruction. *State v. Ferguson*, 5 Ohio St.3d 160, 163, 450 N.E.2d 265 (1983). Accordingly, we fail to see how the State's comment would have prejudiced Ramey.

{¶ 41} Ramey further contends the prosecution misstated the evidence when it remarked that Ramey was uncooperative during the Memorial Day shooting investigation. In making this comment, the prosecutor noted that Ramey would not tell Detective Dewine what happened during the shooting. Since Dewine testified that Ramey never said who shot him, and then Ramey testified at trial that Walker shot him, we do not find the prosecutor misstated the evidence, as Ramey did not cooperate in that he did not provide

this important piece of information to Dewine when asked about it during the investigation.

{¶ 42} Ramey also believes the prosecutor misstated the evidence when he said that trial was the first time Ramey told anyone that Walker had shot him and that Sherry Miller testified the green SUV and white car drove off in the same direction. However, upon review, we find each of these comments did not misstate the evidence, as they are supported by the testimony in the record.

{¶ 43} In addition, Ramey argues that that the prosecutor misstated the evidence when he indicated that Ramey was part of a gang. The record, however, indicates that the prosecutor never directly stated that Ramey was in a gang, but rather recapped all the evidence that infers a gang relation. Specifically, the prosecutor said:

> No one has come in here and identified these guys as a gang. Let's talk about this. You've got two feuding groups of young men. Both, we know, carry guns. Both identify with a name, ABE, the group of 100, or maybe the guys who admit by themselves as 100. You know they assigned the symbol to identify themselves, the 100 emoji. That gives you a peek at what's going on here. That gives you a peek of who he's associated with, who he's hanging out, and what the real story is. He doesn't want you to believe that he's wrapped up in it, but he's—and the evidence shows that. Why doesn't he want you to believe that? Because his participation with this crew, his encouragement, his enticement, the fact that something that happened to him shows you that this is a team. He's on a team, and he's— they work as a unit. They work together as a unit, and he's on the hook for their criminal activity if he knows about it.

Trial Trans. Vol. III (Oct. 8, 2014), p. 620-621. Because the foregoing statement is an accurate portrayal of the testimony with the prosecutor's inferences taken therefrom, we do not find it was improper.

{¶ 44} Finally, Ramey argues that the prosecutor misstated the law when discussing complicity and reasonable doubt. In discussing complicity, the prosecutor gave an abbreviated recitation of the law and defense counsel objected. The trial court agreed that the prosecutor's explanation of the law on complicity was incomplete and the parties thereafter agreed that the prosecutor would stop the discussion and allow the jury to rely on the trial court's jury instructions. Shortly thereafter, the trial court provided the jury with the proper instruction on the law of complicity. Again, we must presume that the jury followed the court's instruction. *Ferguson*, 5 Ohio St.3d at 163, 450 N.E.2d 265. Accordingly, we fail to see how the prosecutor's comment prejudiced Ramey.

{¶ 45} As for reasonable doubt, Ramey takes issue with the fact that the prosecutor equated it to a puzzle and advised the jury that it only needed enough pieces to be convinced of what the picture was. We reviewed this exact same issue in *State v. Ford*, 2d Dist. Clark No. 2005-CA-76, 2006-Ohio-2108, in which we held:

> Although we stop short of expressing our entire approval of this form of argument, both sides are entitled to some latitude in closing argument. We doubt that it will come as any surprise to a jury that each counsel is trying to "spin" the evidence adduced in ways helpful to their client's interests. We cannot say that this argument constitutes misconduct.

*Id.* at ¶ 46. The same rationale that we stated in *Ford* applies here.

{¶ 46} For the foregoing reasons we do not believe the prosecutor's statements

were improper and/or prejudicial. Accordingly Ramey's First Assignment of Error is overruled.

**Second Assignment of Error**

{¶ 47} Ramey's Second Assignment of Error is as follows:

THERE WAS INSUFFICIENT EVIDENCE THAT RAMEY WAS

COMPLICIT IN COMMITTING FELONIOUS ASSAULT OR DISCHARING

A FIREARM INTO A HABITATION BECAUSE THE EVIDENCE SHOWS

HE WAS MERELY PRESENT, NOT PARTICIPATING.

{¶ 48} Under his Second Assignment of Error, Ramey argues his convictions for complicity to improperly discharging a firearm at or into a habitation and complicity to felonious assault were not supported by sufficient evidence and were against the manifest weight of the evidence. Specifically, Ramey claims there was insufficient evidence to demonstrate that he knowingly aided and abetted the drive-by shooting that formed the basis of the charges. We again disagree.

{¶ 49} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683

N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 50} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 51} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances.

*Martin* at 175.

{¶ 52} As previously noted, Ramey challenges his conviction for complicity to improperly discharging a firearm at or into a habitation in violation of R.C. 2923.03(A)(2) and R.C. 2923.161(A)(1), and complicity to felonious assault in violation of R.C. 2923.03(A)(2) and R.C. 2903.11(A)(2). "Complicity" is defined in R.C. 2923.03(A)(2) as: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a] id or abet another in committing the offense[.]"

{¶ 53} A person aids and abets the commission of a crime when he supports, assists, encourages, cooperates, advises or incites the principal offender in the commission of the offense, and shares the criminal intent of the principal offender. *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001), syllabus. "Ohio courts have recognized that '[e]vidence of aiding and abetting another in the commission of crime may be demonstrated by both direct and circumstantial evidence.' " *State v. Wade*, 2d Dist. Clark No. 06-CA-108, 2007-Ohio-6611, ¶ 20, quoting *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981). "Thus, ' "participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed." ' " *Id.,* quoting *Cartellone*, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

{¶ 54} The underlying offense of improperly discharging a firearm at or into a habitation occurs when a person "without privilege to do so, * * * knowingly * * * [d]ischarge[s] a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual." R.C. 2923.161(A)(1). The underlying offense of felonious assault occurs when a person "knowingly * * * [c]ause[s] or attempt[s] to cause serious

physical harm to another[.]" R.C. 2903.11(A)(2). Therefore, the culpability required for complicity to these offenses is knowingly. In other words, the evidence must demonstrate that Ramey knowingly aided or abetted the principal offender in improperly discharging a firearm at or into a habitation and in committing felonious assault.

{¶ 55} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 56} While Ramey testified that he had no knowledge that Freeman was going to shoot at A.J's residence nor assisted Freeman in the shooting, we conclude there was sufficient circumstantial evidence for a rational finder of fact to conclude otherwise. First, it can be inferred from the evidence that Ramey had reason to seek revenge against Walker. Not only were Walker and Ramey members of feuding groups in the wake of the shooting death of Walker's best friend, but Ramey testified that Walker fired the shot that hit him in the head on Memorial Day, which was only sixteen days before the drive-by shooting in question.

{¶ 57} More importantly, a rational finder of fact could infer from the evidence that Ramey had a role in the drive-by shooting based on his actions before, during, and after the shooting. Both Walker and his mother saw Ramey drive by Walker's house just hours prior to the shooting, and Walker saw Ramey drive by on more than one occasion. Ramey also posted a message on his Twitter account eight hours before the shooting that was arguably directed at Walker since it said "[s]hoot me again try yo luck[,]" and Ramey identified Walker as the one who shot him on Memorial Day. The message was

also resent by Deaerius McWhorter, who Walker claimed he saw in the SUV with Ramey during the shooting.

{¶ 58} Moreover, Ramey admitted that he was following Freeman's vehicle at the time of the shooting and multiple witnesses saw that Ramey's green SUV was following closely behind the white vehicle. Walker's neighbor, Sherry Miller, even testified that the two vehicles were clearly moving together. Miller also testified that after the shooting, the two vehicles went to the end of the block and turned in the same direction.

{¶ 59} Furthermore, Ramey testified that he and Freeman had communicated with each other at the end of his graduation ceremony, which concluded just 30 minutes prior to the shooting. Ramey also admitted to picking Freeman up after the shooting and allowing him to put the gun in the glove box of his SUV. Finally, expert testing verified that the gun in the glove box was the same gun that was used in the shooting. Ramey testified that he permitted Freeman to leave the gun in his glove box despite knowing it was evidence of a crime.

{¶ 60} Taken together, Ramey's feud with Walker, his presence at the scene of the shooting, his companionship with Freeman, and his conduct before, during, and after the shooting, would permit a rational finder of fact to infer that Ramey knowingly aided and abetted the principal offenses of improperly discharging a firearm into a habitation and felonious assault. Although much of the evidence against Ramey is circumstantial, circumstantial evidence and direct evidence are of equal value, especially because some facts can only be proved by circumstantial evidence. *State v. Jackson*, 2d Dist. Montgomery No. 24430, 2012-Ohio-2335, ¶ 129, citing *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991). Therefore, because the aforementioned evidence would

permit a rational trier of fact to infer that Ramey did knowingly aid and abet Freeman in improperly discharging a firearm at or into a habitation and in committing felonious assault, we find there was sufficient evidence of complicity to commit those principal offenses.

{¶ 61} In so holding, we note that the jury, as the finder of fact and judge of witness credibility, was not obligated to believe Ramey's testimony that he did not assist or incite the shooting and had no knowledge that it was going to take place. The jury was also not required to believe Ramey's testimony that he did not follow Freeman's vehicle after the shooting or that his Twitter message had nothing to do with Walker. The record indicates that the jury did not find Ramey's version of events credible and we will not disturb that finding on appeal. We also cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice by weighing the evidence as it did.

{¶ 62} Ramey's Second Assignment of Error is overruled.

**Third Assignment of Error**

{¶ 63} Ramey's Third Assignment of Error is as follows:

THE TRIAL COURT ERRED IN FAILING TO MERGE RAMEY'S CONVICTIONS FOR DISCHARGING A FIREARM INTO A HABITATION AND FELONIOUS ASSAULT.

{¶ 64} Under his Third Assignment of Error, Ramey contends that the complicity to improperly discharging a firearm at or into a habitation and complicity to felonious assault offenses are allied offenses of similar import that should have been merged at sentencing. According to Ramey, the act of firing multiple shots at a residence involved

only a single course of conduct and a single animus for which he could be complicit. Under the specific circumstances of this case, we disagree.

{¶ 65} The appellate review of a trial court's allied-offenses ruling is de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. When the offender's conduct supports more than one offense a court must conduct an analysis of allied offenses of similar import to determine whether the offenses merge or whether the defendant may be convicted of separate offenses. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 24, citing R.C. 2941.25(B).

{¶ 66} Ohio's allied offense statute, R.C. 2941.25, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 67} "Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation." *Ruff* at ¶ 30.

**{¶ 68}** Therefore, "[w]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?  An affirmative answer to any of the above will permit separate convictions."  *Id.* at ¶ 31.

**{¶ 69}** In *State v. Woodum*, 2d Dist. Montgomery No. 25217, 2013-Ohio-3287, this court stated that:

> We can envision a scenario where a defendant fires shots into a residence at locations where he knows or expects particular people to be, and also fires indiscriminately into the residence in the same burst of gunfire. However, in the absence of specific information to separate the conduct of targeting specific persons from the conduct of shooting at the residence itself, the offenses also typically are not committed "separately" where a defendant fires the multiple shots in rapid succession.  * * * The real question is whether [the defendant] committed his offenses with a separate "animus," which refers to his purpose or immediate motive which may be inferred from the circumstances.

(Citation omitted.)  *Id.* at ¶ 5.

**{¶ 70}** The term "animus" means " 'purpose or, more properly, immediate motive.' " *State v. Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857, ¶ 40, quoting *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979).  (Other citations omitted.) "Where an individual's immediate motive involves the commission of one offense, but in

the course of committing that crime he must, A priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime." *Logan* at 131.

**{¶ 71}** "Like all mental states, animus is often difficult to prove directly, but must be inferred from the surrounding circumstances." (Citations omitted.) *Id.* "Thus the manner in which a defendant engages in a course of conduct may indicate distinct purposes." (Citations omitted.) *State v. Whipple*, 2012-Ohio-2938, 972 N.E.2d 1141, ¶ 38 (1st Dist.). "Courts should consider what facts appear in the record that 'distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed.' " *Id.*, quoting *State v. Glenn*, 8th Dist. Cuyahoga No. 94425, 2012-Ohio-1530, ¶ 9.

**{¶ 72}** Based on varying factual circumstances, courts have reached different conclusions as to whether improperly discharging a firearm into a habitation and felonious assault merge under R.C. 2941.25. For instance, in *Whipple* and *State v. Kelly*, 5th Dist. Stark No. 2012CA00067, 2012-Ohio-5875, it was determined that felonious assault and improperly discharging a firearm into a habitation were committed with a separate animus because the large amount of gunshots fired and the level of destruction to the property demonstrated that the shooters sought to do more than just commit felonious assault. *Whipple* at ¶ 40-42; *Kelly* at ¶ 26. Therefore, "[g]enerally speaking, evidence that a defendant fired a large number of shots or 'shot up' a residence tends to support a finding of a separate animus." (Citations omitted.) *Woodum*, 2d Dist. Montgomery No. 25217, 2013-Ohio-3287 at ¶ 7.

**{¶ 73}** By contrast, in *State v. Lavender*, 1st Dist. Hamilton No. C-120508, 2013-

Ohio-2508, felonious assault and improper discharge of a firearm into a habitation were not found to be committed with a separate animus where the defendant approached the victim's residence and shot a single series of three bullets into the residence towards the victim as the victim opened the front door. *Id.* at ¶ 9, 15. The court reasoned there was no indication that the defendant had any motive other than to shoot the victim. *Id.* at ¶ 15.

{¶ 74} Similarly, in *State v. Jackson*, 2013-Ohio-5557, 5 N.E.3d 116 (9th Dist.), no separate animus was found were the defendant fired several shots into an open doorway of a fraternity house and into a hallway full of people who ran inside fleeing as the shooting began, as the evidence indicated the defendant's intent was to injure the people inside and that the improper discharge of a firearm was incidental. *Id.* at ¶ 28. *See also State v. Hodges*, 1st Dist. Hamilton No. C-110630, 2013-Ohio-1195 (felonious assault and improper discharge into a habitation merged where the defendant shot the victim but errant bullets struck a nearby apartment building because the defendant's immediate motive was clearly to injure the victim after a verbal altercation).

{¶ 75} In this case, Ramey's offenses of complicity to improperly discharging a firearm at or into a habitation and complicity to felonious assault are based on the principal offender's conduct of firing a single series of four bullets at Walker's residence from his vehicle. The State contends it was appropriate for the trial court not to merge these offenses at sentencing because one of the bullets was shot directly at Walker and his mother on the front porch, while the other three bullets were all fired at an area underneath the front windows of the residence. According to the State, the bullet fired at Walker and his mother was committed with a separate animus from the three bullets fired at the three

windows. Ramey, on the other hand, contends that the two offenses stemmed from the exact same conduct of shooting at Walker's residence and that there was no direct evidence that Ramey intended for the house and Walker to be shot separately.

{¶ 76} The evidence in this case demonstrates that the two vehicles involved in the shooting were traveling south down Lincoln Park South toward Johnson Street when they drove by Walker's residence. The photographic evidence depicting the exterior of Walker's residence indicates that the vehicles would have traveled past the residence's front windows before the front porch. The same photographs and the testimony from Officer Steinmetz indicate that the first three shots were fired underneath the front windows and were fairly low to the ground. Steinmetz testified the first shot underneath the northern-most-front window was only about seven inches from the ground, and the two other shots fired underneath the southern-most-front window were just slightly higher. *See* Trial Trans. Vol. II (Oct. 7, 2014), p. 280. The fourth and final shot, however, was fired at the front porch and near the front door where Walker and his mother testified they were standing. The photographs also show that the fourth shot was fired at a higher trajectory than the first three shots at the windows.

{¶ 77} In addition, Walker's testimony indicates that he was sitting on a green electrical box that was located in a parking lot to the south of his residence when he saw the vehicles approaching. He testified that upon seeing Ramey's green SUV, he ran back to his front porch and then heard the gunshots. Given that the vehicles were traveling south toward Walker's residence and Walker was running in a northern direction towards his front porch, the evidence does not indicate that the shooter was firing in Walker's path of travel. If that were the case, then it could be inferred that all shots were

fired with the single animus to shoot Walker. Instead, the first three shots were fired low to the ground and underneath the front windows while Walker was coming from the opposite side of the house. This permits an inference that those shots were not fired with an intent to hit Walker. The fourth shot, however, was fired at a higher trajectory and in an area where Walker and his mother had been standing. This indicates that the fourth shot was indeed an attempt to hit Walker, who Ramey had been feuding with.

{¶ 78} Accordingly, based on the circumstances of this case, specifically the location of the bullet holes and Walker's position at the time of the shooting, we find that the trial court did not err in failing to merge the complicity to commit felonious assault and complicity to improperly discharge a firearm offenses at sentencing, as it can be inferred from the evidence that the bullet fired at Walker and his mother was committed with a separate animus from the three bullets fired underneath the three windows, as those shots were fired low to the ground and in an area less likely to hit anyone.

{¶ 79} Ramey's Third Assignment of Error is overruled.


**Fourth Assignment of Error**

{¶ 80} Ramey's Fourth Assignment of Error is as follows:

THE TRIAL COURT ERRED IN IMPOSING MAXIMUM, CONSECUTIVE SENTENCES ON RAMEY BASED UPON THE TESTIMONY OF HIS LIMITED INVOLVEMENT IN THE OFFENSE AND THE PRESENCE OF SEVERAL MITIGATING FACTORS.

{¶ 81} Under his Fourth Assignment of error, Ramey challenges several aspects of his aggregate 16-year prison sentence. Specifically, he contends the trial court erred

by: (1) ordering consecutive sentences; (2) imposing a prison term for improperly handling a firearm in a motor vehicle; (3) imposing the maximum possible prison terms for his complicity to commit felonious assault and tampering with evidence offenses; and (4) imposing a sentence that, according to Ramey, amounts to cruel and unusual punishment in violation of the Eighth Amendment.

{¶ 82} In reviewing felony sentences, we no longer use an abuse-of-discretion standard of review, but apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Rodeffer*, 2013-Ohio-5759, 5 N.E.3d 1069, ¶ 29 (2d Dist.). This statute provides:

> The appellate court may increase, reduce, or otherwise modify a sentence
>
> that is appealed under this section or may vacate the sentence and remand
>
> the matter to the sentencing court for resentencing. The appellate court's
>
> standard for review is not whether the sentencing court abused its
>
> discretion. The appellate court may take any action authorized by this
>
> division if it clearly and convincingly finds either of the following:
>
> (a) That the record does not support the sentencing court's findings under
>
> division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section
>
> 2929.14, or division (I) of section 2929. 20 of the Revised Code, whichever,
>
> if any, is relevant;
>
> (b) That the sentence is otherwise contrary to law.

R.C. 2953.08(G)(2).

{¶ 83} Thus, R.C. 2953.08(G)(2) requires an appellate court to review the entire record to determine if it clearly and convincingly finds that the record does not support the sentencing court's statutory findings or if the sentence is otherwise contrary to law. "It is

important to note 'that the clear and convincing standard used by R.C. 2953.08(G)(2) is written in the negative. It does not say that the trial judge must have clear and convincing evidence to support its findings. Instead, it is the court of appeals that must clearly and convincingly find that the record does not support the court's findings.' " *Rodeffer* at ¶ 31, quoting *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 21 (8th Dist.). " 'In other words, the restriction is on the appellate court, not the trial judge. This is an extremely deferential standard of review.' " *Id.* Therefore, as long as a trial court makes the appropriate statutory findings, the consecutive nature of its sentencing should stand unless the record overwhelmingly supports a contrary result.

{¶ 84} In this case, Ramey challenges the trial court's decision to impose consecutive sentences. R.C. 2929.14(C)(4) allows for the imposition of consecutive sentences if the trial court finds that: (1) consecutive service is necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one or more of the following three findings are satisfied:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single

prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c). A trial court is not required to state reasons to support these statutory findings. *State v. Kay*, 2d Dist. Montgomery No. 26344, 2015-Ohio-4403, ¶ 13, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 16.

{¶ 85} In this case, the trial court found that consecutive sentences are: (1) necessary to protect the public from future crime and to punish the offender; (2) are not disproportionate to the seriousness of the defendant's conduct and the danger he poses to the public; and (3) that at least two of the multiple offenses were committed as a part of a course of conduct and the harm caused by the multiple offenses has been so great or unusual that no single prison term for any of the offenses committed as a part of the course of conduct adequately reflects the seriousness of his conduct.

{¶ 86} Having reviewed the record, we do not clearly and convincingly find that the record does not support the trial court's first two consecutive-sentence findings. Specifically, Ramey was complicit in a drive-by shooting in a residential neighborhood. Furthermore, after the shooting, Ramey allowed the weapon to be stored in his glove box, and then drove around his community with the loaded weapon. The record also indicates that Ramey and his group of friends have been involved in similar shooting altercations in the past, one of which Ramey was injured and another which resulted in the death of Jeff Wellington. Ramey also demonstrated a serious lack of respect for law

enforcement, as he continually lied throughout the investigation of this case and during the investigation of the Memorial Day shooting as well. Ramey's conduct and the gun violence he is immersed in is very serious and clearly poses a danger to the public. Consecutive sentences would no doubt protect the public from future shooting incidents and are not disproportionate to the severity of Ramey's conduct.

{¶ 87} As for the third consecutive-sentence finding, we note that "the focus of this factor is the 'so great or unusual' finding required to distinguish this offense from other identical offenses, and how this offense was part of a 'course of conduct,' which elevates the seriousness of the crime and the need for greater punishment." *Kay*, 2d Dist. Montgomery No. 26344, 2015-Ohio-4403 at ¶ 18. The Supreme Court of Ohio held that course of conduct may be established by factual links including time, location, weapon, cause of death or similar motivation. *State v. Short*, 129 Ohio St. 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 144.

{¶ 88} Here, Ramey's offenses all occurred on the same day, revolved around the same drive-by shooting, and involved the same weapon. Accordingly, we do not clearly and convincingly find that the record does not support the trial court's finding that at least two of the multiple offenses were committed as a part of a course of conduct.

{¶ 89} We also cannot say that the record clearly and convincingly fails to support a conclusion that the harm caused by Ramey's multiple offenses was so great or unusual that consecutive sentences were required. Again, given our deferential review, there must be an overwhelming absence of evidence in the record supporting this finding, and that is not the case here. In gauging the extent of the resulting harm, we note that a sentencing court may rely on its own observations of the testimony and evidence, as well

as the demeanor of the victims while presiding over trial. The trial court in this case heard evidence of reoccurring gun violence plaguing the community and Ramey and his accomplice wreaking havoc on the night in question. The shooting not only affected those involved in the feud, but other unrelated parties as well, such as Walker's mother and the neighbors who witnessed the shooting. We also note that Walker's mother was hysterical during the call she made to 9-1-1 and clearly feared for her and her son's life. Accordingly we cannot clearly and convincingly say that there is an overwhelming absence of evidence in the record supporting the trial court's finding that the harm caused by Ramey's course of conducted warranted consecutive sentences.

{¶ 90} Next, Ramey claims the trial court erred in imposing a prison term for improperly handling a firearm in a motor vehicle. Under 2929.13(B)(2), in determining whether to impose a prison term as a sanction for a fourth degree felony, such as improperly handling a firearm, the trial court was required to comply with the purposes and principles of sentencing under section 2929.11 of the Revised Code and with section 2929.12 of the Revised Code. We do not clearly and convincingly find that the trial court did not make these considerations, as the trial court specifically stated in its sentencing entry that it had considered those provisions.

{¶ 91} Likewise, the trial court did not err in imposing the maximum possible prison terms for the complicity to commit felonious assault and tampering with evidence offenses. " 'The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences.' " *State v. Eicholtz*, 2d Dist. Clark No. 2012 CA 7, 2013-Ohio-302, ¶ 53, quoting *State v. Nelson*, 2d Dist.

Montgomery No. 25026, 2012-Ohio-5797, ¶ 62.

{¶ 92} Here, each individual sentence imposed by the trial court was within the prescribed statutory range. The trial court also indicated in its sentencing entry that it considered the purposes and principles of sentencing in R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12. Accordingly, the sentence is not contrary to law. *See Rodeffer*, 2013-Ohio-5759, 5 N.E.3d 1069 at ¶ 32, citing *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 18 ("a sentence is not contrary to law when the trial court imposes a sentence within the statutory range, after expressly stating that it had considered the purposes and principles of sentencing set forth in R.C. 2929.11, as well as the factors in R.C. 2929.12").

{¶ 93} With respect to Ramey's Eighth Amendment challenge, we note that "Eighth Amendment violations are rare, and instances of cruel and unusual punishment are limited to those punishments, which, under the circumstances, would be considered shocking to any reasonable person." (Citations omitted.) *State v. Harding*, 2d Dist. Montgomery No. 20801, 2006-Ohio-481, ¶ 77. "[W]e are bound to give substantial deference to the General Assembly, which has established a specific range of punishment for every offense and authorized consecutive sentences for multiple offenses." (Citation omitted.) *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, ¶ 24. Therefore, " 'as a general rule, a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment.' " *Id.* at ¶ 21, quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69, 203 N.E.2d 334 (1964). (Other citations omitted.) Given that each of Ramey's prison terms fall within the specific range of punishment that is prescribed by statute and the imposition of consecutive sentences

is not contrary to law, we do not find that his aggregate 16-year prison sentence constitutes cruel and unusual punishment under the Eighth Amendment.

**{¶ 94}** We note that the State moved to strike two Montgomery County Court of Common Pleas cases cited by Ramey in support of his Eighth Amendment argument, as well as the appendices to his brief, which contained certain pleadings from those cases. On September 21, 2015, we issued a decision and entry indicating that we would issue a decision on the State's motion within the merits of this appeal. Because the two cases and attached documentation at issue are not dispositive of the outcome of the appeal, we find the matter to be moot.

**{¶ 95}** Ramey's Fourth Assignment of Error is overruled.

## Conclusion

**{¶ 96}** Having overruled all four of Ramey's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FAIN, J. concurs.

DONOVAN, J., concurring in judgment only.

Copies mailed to:

Ryan A. Saunders
Jon Paul Rion
Nicole Rutter-Hirth
Hon. Douglas M. Rastatter